CHARLES E. TAYLOR, FRANCIS K. FARMER AND HUGH DUFFY,

*vs.*

SAMUEL K. SMITH, WILLIAM B. MEGEAR, I. PUSEY WICKERSHAM, constituting and composing the "Department of Public Safety for the City of Wilmington", and SAMUEL J. WHITE, City Treasurer of the City of Wilmington, and THE MAYOR AND COUNCIL OF WILMINGTON, AND VOLUNTEER FIREMEN'S RELIEF ASSOCIATION.

## *New Castle, Aug.* 27, 1921.

In matters involving the exercise of discretion, courts have no right to substitute their judgment of what is best for the judgment of the officers on whom the law casts the responsibility of deciding.

The sale of a bond issue, recommended by a plan for establishing a fire department for the City of Wilmington under Act March 16, 1921 (32 *Del. Laws, c.* 111), approved by the City Council, cannot be enjoined under an objection that the plan submitted to the Council was not such as the act contemplated; the Council having the discretionary power of approving or disapproving the judgment of the Department of Public Safety submitting the plan, even though the Council displayed bad business judgment.

The taking over of property of fire companies in the City of Wilmington, under Act March 16, 1921 (32 *Del. Laws,* c. 111), creating the Department of Public Safety and providing for the establishment of a fire department, need not precede the passage of an ordinance approving the plan of the department, or sale of bonds to pay for such property.

It was proper for the Council of the City of Wilmington to provide for the issuance of bonds to the amount of the estimated cost of property to be taken over, under Act March 16, 1921 (32 *Del. Laws, c.* 111), creating the Department of Public Safety and providing for the establishment of a fire department, by taking over property of fire companies in the city, but only so many of the bonds so authorized may be actually issued as will equal the actual cost of the property taken over.

. The provision of Act General Assembly March 16, 1921 (32 *Del. Laws, c.* 111), § 6, relating to the creation of a Department of Public Safety for the City of Wilmington and the establishment of a fire department, to the effect that the amount of bonds issued in payment of property taken over shall not exceed the cost of the property, contemplates that the bonds must be sold at par.

An ordinance of the City of Wilmington in relation to publicly inviting bids for materials to be furnished and work to be done applies to the Department of Public Safety, created by Act March 16, 1921 (32 *Del. Laws, c.* 111), in connection with the establishment of a fire department, except where specific property is to be purchased under the act, and the contracts are of such nature that they are in reason excluded from the operation thereof.

The act of the Legislature requiring that couplings for fire hose throughout the state should be the same as were in use in the City of Wilmington did not prevent the Department of Public Safety of such city, created by Act March 16, 1921 (32 *Del Laws, c.* 111), from adopting screw couplings in lieu of snap couplings then in use.

A department of a city cannot be enjoined from purchasing screw couplings for fire hose under an ordinance requiring that snap couplings be used; the proper time to ask for the injunction being when use thereof is undertaken.

If a payment of a fund by the City of Wilmington to the Firemen's Volunteer Relief Association under Act March 16, 1921 (32 *Del. Laws; c.*111), is a gratuity, it is forbidden by *Constitution Article VIII,* § 8.

No final decree can be made prejudicial to a person having a material interest in the subject-matter of a suit, unless such person is before the court as a party.

When legislative authority, whether state or municipal, acting within the scope of its lawful power, declares what the law shall be, it is not in the power of any court by forced construction to substitute for the law as written its own conception of what the law ought to be.

INJUNCTION BILL.   The bill as amended seeks to enjoin the payment of money and the issuance of municipal bonds by the authorities of the City of Wilmington, under the provisions of the act of the Legislature (*chapter* 111, *vol.* 32, *Laws of Delaware*) entitled "An act creating a Department of Public Safety for the City of Wilmington, and prescribing its powers."   The act, or so much thereof as is pertinent to the questions involved, provides as follows:

"*Section* 5.   That on and after the first day of May, A. D. 1921, 'The Mayor and Council of Wilmington' is hereby authorized and empowered through the agency of the 'Department of Public Safety' hereby created, con-

stituted and appointed, and their successors in office, to prepare a plan for the establishment of a fire department for said city, and the estimated costs thereof, and to take over for public use, by purchase, compromise, condemnation as hereinafter provided, or otherwise, such real and personal property of the several fire companies of the City of Wilmington, Delaware, as were in existence and recognized by 'The Mayor and Council of Wilmington' as a part of the fire department of the said city, on September first, A. D. 1918, as a competent appraiser, or appraisers, may deem worthy of being used in a fire department of a city of its class, together with such other property as may be necessary, at such price or prices as may be determined in any of the above proceedings, or agreed upon by the Department of Public Safety in agreements to purchase the same. If said plan is approved by 'The Council,' of 'The Mayor and Council of Wilmington,' the said Department of Public Safety shall proceed to acquire by gift, purchase, condemnation as hereinafter provided, or otherwise, such real and personal property as may be contemplated in said plan. Any fire company may reserve the right to accept or reject the amount agreed upon by the appraisers.

"*Section* 6. For the purpose of defraying all the costs and expenses of acquiring such real and personal property of fire companies, or otherwise, as are considered by the above mentioned competent appraiser or appraisers, as necessary and worthy of being used by the said Department of Public Safety 'The Council,' of 'The Mayor and Council of Wilmington,' shall have power to issue bonds to an amount not exceeding the cost of such real and personal property so taken over, plus the cost of such additional real estate and personal property that is deemed by the Department of Public Safety necessary to buy, to establish an efficient fire department, and as contemplated in said plans heretofore approved by 'The Council.' Said bonds shall be sinking fund bonds to be issued in manner and from as 'The Council,' of 'The Mayor and Council of Wilmington,' shall determine, the same to be approved as to form by the City Solicitor of the City of Wilmington.

"All the aforesaid bonds shall be signed by the Mayor, and countersigned by the City Treasurer and City Auditor, in the same manner as other bonds of the City of Wilmington, and a record thereof shall be made and kept by the said auditor and treasurer respectively.

"*Section* 7. The Department of Public Safety may, from time to time, submit to 'The Council,' of 'The Mayor and Council of Wilmington,' plans for extensions, enlargements or additions to its original plan as approved by 'The Council' of 'The Mayor and Council of Wilmington,' for the further improvement of the police and fire departments of the City of Wilmington, as it may deem desirable; upon receiving the approval of 'The Council,' of 'The Mayor and Council of Wilmington,' the same shall be added to and made a part of the original plan. 'The Council,' of 'The Mayor and Council of Wilmington,' upon giving its approval thereto, may then proceed by ordinance to borrow upon the faith and credit of 'The Mayor and Council of Wilmington,' such additional sum or sums of money as may be necessary

to enable the said Department of Public Safety to carry out the said supplemental plan, to be expended in the same manner as heretofore prescribed in this Act for the original plan.

*     *     *     *     *     *

"*Section* 9. Immediately after the taking over by the Department of Public Safety of said real and personal property, the fire department of the City of Wilmington shall be under the control and management of the said Department of Public Safety, and the said department shall have the power, and it shall be its duty, to cause to be done, performed and observed, all the regulations, matters and things prescribed by law, or by the charter and ordinances of the City of Wilmington relating to fire protection, in the City of Wilmington.

*     *     *     *     *     *

"*Section* 13. Within three months after the taking over by the 'Department of Public Safety,' of the real and personal property of the several fire companies, the said 'The Mayor and Council of Wilmington' shall pay to the proper officers of the Volunteer Firemen's Relief Association, the sum of fifteen thousand dollars, the same being in full payment for all claims and demands whatsoever."

The Department of Public Safety, newly created by this act, undertaking to act in accordance with the provisions of *Section* 5, prepared a plan for the establishment of a fire department and submitted the same to the Council of the city for its approval. This plan, so submitted, was presented to the council by the following communication:

"To the President and Members of Council, Municipal Building, Wilmington, Delaware.

Gentlemen:

"Pursuant to an act creating the Department of Public Safety for the City of Wilmington, passed by the Delaware Legislature 1921, the directors of the Department of Public Safety herewith submit their report covering a general plan preparing for the establishment of a fire department for the City of Wilmington, and the estimated costs thereof.

"The study of the City of Wilmington's needs as to a fire department is, for the purpose of this plan, divided into four divisions, which may be amplified extended and subdivided as the growth and needs of the city justify.

1. The acquisition and location by the city of fire houses at an estimated cost of three hundred and three thousand five hundred dollars. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $303,500

2. Additions and repairs to fire houses at an estimated cost of one hundred thousand dollars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100,000

Statement of the Case.

3. The acquisition of fire equipment now owned by the several volunteer fire companies in the City of Wilmington at an estimated cost of one hundred fifteen thousand dollars ................. 115,000

4. The acquisition by the city of new fire equipment at an estimated cost of one hundred eight thousand five hundred dollars ........ 108,500

5. Improvements and additions to the fire alarm telegraph at an estimated cost of fifteen thousand dollars ................... 15,000

6. Organization expenses, including the employment of trained experts and other necessary expenses, at an estimated cost of fifteen thousand dollars ................................... 15,000

7. Uniforms and firemen's equipment at an estimated cost of forty thousand dollars ........................................ 40,000

$697,000

"If your honorable body approves the above plan you are hereby requested to cause to be issued bonds which when sold will net this department six hundred ninety-seven thousand dollars ($697,000) for the purpose of establishing a paid fire department in accordance with said plan.

"Respectfully,

"S. K. Smith,
"I. P. Wickersham,
"Wm. B. Megear,
"Directors Department of Public Safety."

The Council, upon whom the law had cast the responsibility of passing upon the plan, was satisfied with that which was presented, and on June 30 last, attempting to act under the authority of *Section* 6, it passed an ordinance providing for the issuance and sale of bonds in the amount of $697,000, which is the amount of the total estimated cost of establishing the fire department as evidenced by the plan above referred to.

The bonds were duly advertised for sale and were sold to a New York purchaser at a price below par. They have not yet been delivered. The bill asks that their delivery be enjoined, on the ground (1) that there never was any plan submitted to the Council by the Department of Public Safety within the meaning of *Section* 5, that the communication above quoted was only a "pretended plan," and that it is not permitted to predicate the bond issue on such pretended plan; (2) on the ground that the bonds "did not represent the cost of the property taken over, but was in excess of the same"; and (3) the property taken over was taken over after

the passage of the ordinance and after the sale of the bonds, and was contrary to law."

There is an ordinance of the City of Wilmington which provides as follows:

"An ordinance providing that work for the City shall be done by contract.

"*Section* 1.   For all work and labor hereafter required to be done, and goods, chattels, wares, merchandise, materials, tools, implements, and machinery, to be furnished or had and used by or on account of the City, where the cost in any particular case will probably exceed the sum of fifty dollars, the officer or committee having such business in charge, shall publicly invite sealed proposals for the doing of such work and the furnishing of such goods, chattels, wares, merchandise, materials, tools, implements, and machinery, and give the contract to the lowest bidder or bidders."   *Charter, Laws and Ordinances, City of Wilmington, p. 978.*

The bill charges that this ordinance was violated by the Department of Public Safety in that certain property, viz. fire hose, two fire engines, and two fire trucks, were contracted for "without publicly advertising for competitive bids for the same."   It is further charged that certain repair work on one of the buildings, which work cost about $3,200, was let on contract without such advertising for bids.   With respect to the work on this building, the facts show that the cost for the same was paid before the bill was filed in this cause.   The complainants seek to enjoin the approving of vouchers or the payment of moneys for the purchase of the personal property and for the repair work so charged to have been illegally contracted for.

The bill further seeks to enjoin the payment of $15,000 to the Volunteer Firemen's Relief Association, as provided for in *Section* 13 of the Act of Assembly above quoted, on the ground that the same is a gratuity, and therefore not permitted to be paid to it under the provisions of *Section* 8, *Article VIII*, of the Constitution of this state.   This section is as follows:

"*Section* 8.   No county, city, town or other municipality shall lend its credit or appropriate money to, or assume the debt of, or become a shareholder or joint owner in or with any private corporation or any person or company whatever."

*Robert G. Harman,* for the complainants.

*Reuben Satterthwaite, Jr.,* City Solicitor, for the defendants,

except Volunteer Firemen's Relief Association, which did not appear by solicitor.

THE CHANCELLOR. The bill presents a matter of great interest to the City of Wilmington. It touches, in certain particulars, the creation of a municipal fire department for the city in lieu of the old system of supplying fire protection to the city through the agency of volunteer companies. The court is most reluctant to interpose its extraordinary powers in a way that will interfere with the progress of the work of the Department of Public Safety in its endeavor to carry out the provisions of the act creating it. Yet however great the reluctance, if a case be made out which under the principles of equity jurisprudence entitles the complainants to the remedial processes supplied by equity procedure, relief ought not to be denied.

It is proper to state that the complainants at the hearing repeatedly stated, through their solicitor, that there was no charge or intimation of any kind against the members of the Department of Public Safety which would reflect on their integrity or correctness of motives in all they have thus far done, or sought to do. The only complaint against them is that they have mistakenly interpreted the law governing them.

The main point in the case is whether the sale of the bond issue of $697,000 may, on the present showing, be consummated. The issue has been sold and the only thing remaining to be done with respect to the same is for the purchaser to pay the money and the city, through its proper officer, to deliver the bonds.

The delivery of the bonds is sought to be restrained on three grounds. The first ground is, that there never was any plan submitted to the Council for its approval; that is to say, there never was any "plan" as contemplated by *Section* 5 of the act. This undertakes to raise the question of the sufficiency of the "plan" submitted. The section manifestly intends that the plan for fire protection devised by the new department shall run the gauntlet of inspection by the council before the city can be obligated for funds to carry out such plan. This I suppose to be on the theory that the people, whose money is to be spent, shall through the most popular body of their choosing in the municipality, to an extent at least, have something to say concerning the

scheme by which their property is to be protected from fire and the amount of cost to which they will be put by the same. At all events, the Legislature referred to the Council the discretionary power of approving, or disapproving, the judgment of the department in the matter of plans and estimated costs. This particular plan, whatever the court might think of it, did as a matter of fact receive the approval of the Council, the body designated by the Legislature to pass judgment upon it. There is no charge, or even pretense, of fraud or corruption with which the Council's approval may be tainted. If the Council displayed bad business judgment in approving the plan in question, as is contended by the solicitor for the complainants, that fact does not warrant the court in interfering, for if there is anything well settled it ought to be this, that in matters involving the exercise of discretion, courts have no right to substitute their judgment of what is best for the, judgment of the officers upon whom the law casts the responsibility of deciding.

It is said by Mr. High in his work on *Injunctions*, *4th editi on paragraph* 1240, that—

"No principle of equity jurisprudence is better established than that courts of equity will not sit in review of the proceedings of subordinate political or municipal tribunals, and that where matters are left to the discretion of such bodies, the exercise of that discretion in good faith is conclusive, and will not in the absence of fraud, be disturbed. And the fact ·that the court would have exercised the discretion in a different manner will not warrant ˙it in departing from the rule."

If, therefore, the only objection to the bond ˙issue were this one, namely, that the plan submitted to the Council is not such plan as the act contemplates, the preliminary writ should be denied.

The second ground urged for the issuance of the writ restraining the delivery of the bonds is that the property taken over was taken over after the passage of the ordinance, and after the sale of the bonds, and was contrary to law. With respect to this it is to be first noted, that the property, certainly the great bulk of it, has not as yet been literally taken over at all. It has simply been bargained for at stated prices. Whether this is a taking over within the meaning of the act, as was argued at the

hearing, it is not necessary for me now to determine. This second ground, which is now being dealt with is predicated on the theory that the passing of the bond ordinance and the sale of the bonds must follow, in point of time, the acquiring of, or bargaining for, the property.

I find nothing in the act which justifies this view. The substance of things is what is important. The matter of precedence is of no consequence, unless it be of the substance. In this instance, the thing of substance is that the bonds shall not exceed in amount the cost of the real and personal property taken over. When, in point of time, the bonds shall issue, or be authorized, as related to the taking over of the property, seems to me to be of no consequence, if it prove to be the fact that the bonds when issued do not exceed in amount the cost of the property. If this were the only ground urged, the preliminary writ should be denied.

The third ground urged for the injunction against the delivery of the bonds is that the bonds exceed in amount the cost of the real and personal property taken over. On this ground the preliminary writ will issue.

The Department of Public Safety, as well as the Council, seem to have entertained the view that, under the provisions of the act, in question, it is permissible to obligate the city by bonds to the extent of the estimated cost of establishing the fire department as disclosed by the plan submitted to the Council. This would appear from the fact that the ordinance authorized the issuance and sale of bonds in the amount of $697,000, the exact amount of the estimated cost, and that thereafter this whole block of bonds was offered for sale and sold, before it was known what the cost of the property would be.

That it is proper for the Council to provide for the issuance of bonds to the amount of the estimated cost of the property seems to me to be very clear. But when it comes to acting under such ordinance, the proper officials must see to it that only so many of the bonds so authorized are actually issued as will equal the cost of the property taken over. The bonds issued must not exceed the cost of the property.

Under the affidavits filed, and under the concession of the solicitor for the defendants made at the hearing, it appears that

the cost of the property thus far ''taken over'' is less than the amount of bonds contracted to be sold and awaiting delivery; further, that while all the property which it will be necessary to acquire has not yet been determined upon, yet, in any event, the cost of property ultimately taken over will be less than the amount of bonds issued. This is the fact of the situation as it now appears. The deficiency of cost of property below the amount of bonds sold may be due to a determination not to acquire property in the amount, $697,000, or in any event, it must be due to the fact that the bonds have been sold at below par. This latter circumstance, together with the fact, admitted by the defendants, that no funds other than those derived from the bond sale are available for the purpose, makes it impossible for property to be acquired with the proceeds of the present sale without having the amount of bonds issued exceed the cost of the property acquired, or taken over. For instance, if the $697,000 issue was sold at ninety-six (this is about the figure), property costing $669,120 and no more could be purchased, for this sum would be the total of the proceeds derived from the sale of the bonds. In that event, the city would have issued bonds in excess of the cost of the property taken over.

The language of the act in *Section* 6 thereof is very explicit to the effect that the amount of the bonds issued shall not exceed the cost of the property. By the phrase "bonds to an amount not exceeding the cost of such real and personal property," the par value of the bonds is to be understood. It was urged that inasmuch as *Section* 7 of the act, providing for the issuance of bonds to cover the cost of extensions, enlargements or additions to the original plan, does not specifically limit the amount of the bonds to the cost of such extensions, enlargements or additions, the provision of *Section* 6 in respect to the limitation in amount is to be construed harmoniously with *Section* 7 and that, therefore, the express limitation in *Section* 6 confining the amount of bonds to within the cost of the property is to be disregarded. With this contention it is impossible to agree. Express language cannot be thus controlled. On the point of limitation of the amount of the issue of bonds, the language of *Section* 6 is positive; the language of *Section* 7 is silent. It would be a strange rule of con-

struction which would permit the silence of the one to outspeak the positive expression of the other.

*Section* 6 is the section under which the bonds were issued and sold. That section places a limitation on the amount that may be issued. Where the law limits the amount, it is the duty of the officials having charge of the matter to keep within the limits prescribed by the authority under which they derive their power. This is so, no matter in what form the limitation may be expressed. Where the power of a municipality to borrow money is limited to a certain percentage of the assessed valuation of the property within its jurisdiction, equity will restrain an attempt to issue obligations which, when issued, will carry the debt beyond the amount limited. *Springfield v. Ewdards*, 84 *Ill.* 626.

1 *Dillon on Municipal Corporations*, (5th Ed.) *par.* 294, contains this statement:

"Provisions are frequently made in constitutions or in charters or legislative acts to prevent the creation or increase of indebtedness beyond specified limits or except upon certain conditions. Such limitations have been found by experience to be necessary to prevent extravagance, are remedial in their nature, are based upon a wise policy, and ought, therefore, to be construed and applied to secure the end sought. The cases referred to will show that the courts have fairly given them full effect."

If the facts in this case were such that the court could say that a certain amount of the bonds could be issued within the limitation prescribed by *Section* 6, that is to say, if it appeared that a fractional amount of the $697, 000 could be delivered and those so delivered would not exceed the cost of property taken over, then it might be proper to issue the writ restraining only that part of the issue in excess of the amount thus covering the actual cost, for I can see nothing in the situation that justifies the view that the issue is to be treated as entire and integral within itself so that, if any bonds are delivered, all must be.

In view of the fact, however, that it is conceded that, no matter how many of the bonds are issued, whether all or only a part thereof, the amount outstanding will actually exceed the cost of the real and personal property taken over, because no funds other than those derived from the proceeds of the bonds are available for the purchase of the property, this course cannot be pur-

50      TAYLOR, ET AL., vs. SMITH, ET AL.

Opinion.

sued. The preliminary injunction will, therefore, issue restraining the delivery of all the bonds and the receipt of the money therefor, in accorance with the prayer of the bill.

The bill further complains of the fact that the Department of Public Safety violated the city ordinance in relation to publicly inviting bids for materials to be furnished and work to be done where the probable cost would exceed the sum of fifty dollars.

It was contended by the defendants that this ordinance is not applicable to the Department of Public Safety at this time, while it is in the process of establishing the new fire department, but is applicable only after the real and personal property required for the purpose is taken over and the fire department is established as a going activity. The City Solicitor puts his argument on this point, as follows:

"*Section* 9 of said act provides that immediately after the taking over by the Department of Public Safety of said real and personal property, the fire department of the City of Wilmington shall be under the control and management of the Department of Public Safety, and that said department shall cause to be done, performed and observed all the regulations, matters and things prescribed by law, or by the charter and ordinances of the City of Wilmington relating to fire protection in said city. The Department of Public Safety has not taken over any real and personal property for the purpose of establishing a fire department and it is submitted that, until this is done, said department does not become subject to any ordinances of the City of Wilmington, relating to fire protection, and is, therefore, not subject to the provisions of the ordinance in relation to inviting sealed proposals for work and materials in amount exceeding fifty dollars."

If it be conceded that the department is not subject to the ordinances relating to fire protection until the property is taken over yet it does not follow that, therefore, the department is not subject to the competitive bid ordinance, for the manifest reason that this ordinance is of general application and is not an ordinance relating to fire protection. The Department of Public Safety is an existing agency of the city and has been such since May 1, 1921, as is expressly provided by *Section* 1 of the act creating it. Its members are officers of the city, and as such are clearly subject to the regulations of the ordinance in question whenever the same are properly applicable.

Such ordinances are common throughout the United States.

Their object is to insure to the municipality the benefits of free, competitive bidding, and to render less probable the possibility of fraud and collusion between officials and persons supplying work or materials for the city. In this case, it may be repeated, the complainants disclaim any intimations of such fraud or collusion. The department in negotiating its contracts, took the view that the ordinance was not yet applicable to it. Its action, therefore, was predicated upon a mistaken view of the law.

The purpose of the ordinance being as just indicated, there are, of course, numerous instances when in the nature of things it can have no application. The nature and kinds of contracts that are in reason excluded from the operation of such ordinances as this are varied. For instance, where a certain specific thing is desired and is in the control of a practical monopoly, such ordinance has been held not applicable, for in such case there can be no opportunity to secure competitive bids. *Harlem Gas Light Co. v. Mayor, etc., of N. Y.*, 33 *N. Y.* 309; *Hartford v. Hartford Electric Co.*, 65 *Conn.* 324, 32 *Atl.* 925. Where the article desired is a patented one, and is in the control of only one person, it has been held in some jurisdictions that such an ordinance as this can have no application. *In re Durgo*, 50 *N. Y.* 513; *Asphalt Paving Co. v. Hunt*, 100 *Mo.* 22, 13 *S. W.* 98, 8 *L. R. A.* 110, 18 *Am. St. Rep.* 530; *Silsby Mfg. Co. v. Allentown*, 153 *Pa.* 319, 26 *Atl.* 646. Courts have also recognized certain other instances as exceptions to the rule prescribed by ordinances of this character, such as the securing of services of persons possessed with peculiar scientific knowledge or professional skill, or articles the selection of which involves scientific results attained by mental and corporal labor. For this statement, Dillon on Municipal Corporations is authority.

These are illustrations of the sort of exceptions which courts have written into ordinances of this kind. In the case before me, the bill undertakes to negative the idea of the existence of any exceptional circumstances by alleging, as follows:

"Seventh. The articles or equipment above mentioned, or similar thereto, of equal quality, efficiency, etc., could have been, and can be purchased upon the trade market," etc.

The affidavits filed by the defendants set forth that bids were secured for the hose, engines and trucks from several bidders.

There is no averment that such bids were publicly invited as required by the ordinance. While there are some statements in the affidavits which might indicate that fuller disclosure of the facts would, with respect to some of the articles, indicate, that by reason of their peculiar nature, they should not be held to be within the reason of the ordinance, yet there is not sufficient evidence before me to overcome the positive allegation of the bill to the contrary. The preliminary injunction as prayed for, therefore, with respect to the purchase of the hose, engines and trucks will issue. If the defendants can bring the articles within the category of exceptions to the ordinance in question, they may do so by moving for a dissolution of the injunction with respect to them, and present the necessary facts in the proper way, or await their opportunity on final hearing.

In view of the fact that the work of repairing the building referred to, which work was not let on competitive bid, was paid for before the bill in this cause was filed, the preliminary writ respecting the same will not issue, the payment being a *fait accompli*.

It is further charged by the bill that the Department of Public Safety has contracted to purchase hose with screw couplings in lieu of snap couplings now in use, which, it is charged, is in violation of the following ordinance:

"*Section* 10. After the passage of this ordinance all companies shall have attached the Jones coupling, Pittsburgh standard, and the fire plugs throughout the city shall have attached to them a uniform standard outlet."

And, further, it is urged that this ordinance prevails throughout the entire state by force of the following act of the Legislature (30 *Del. Laws*, *c.* 128):

"An act requiring certain uniform fire equipment in the towns of this state.

"*Section* 1. That wherever there is a water system now or hereafter in use in a town of this state, there shall be adopted and installed the same standard coupling now in use by the fire companies in the City of Wilmington, and the same shall be changed from time to time to conform with any new coupling which shall become standard by adoption in the City of Wilmington."

This act of the Legislature does make applicable to all the towns of the state the rule that they shall make their coupling conform to that set as the standard in the City of Wilmington.

But what that has to do with the power of the Department of Public Safety in the City of Wilmington to adopt any sort of coupling it chooses, I am unable to see. Certainly the act does not fix upon Wilmington the continued use of the present coupling, for it expressly recognizes the right of the city to change the present coupling at any time. In case of such change, the towns must likewise change.

There was discussion at the hearing concerning the meaning of the ordinance and whether the new department is bound by its terms, it being urged by the defendants that the ordinance was a regulation of the several independent volunteer fire companies, designed to secure uniformity of coupling in their hose, a thing greatly to be desired, but which was in danger of not being secured if the several companies were free to follow their own views without some regulation prescribing a rule common to the whole city; and that, there now being a municipal agency set up in whose sole jurisdiction is placed the fire department of the city, with no risk of diversity in couplings as heretofore, the reason for the ordinance no longer exists, and the reason failing, the ordinance fails. Accordingly the defendants contend that the ordinance imposes no restraint on the Department of Public Safety. It is further urged that the ordinance is in terms applicable to fire companies heretofore existing and cannot, therefore, be said to operate on the Department of Public Safety.

These arguments seem to be sound. But I am not called upon to pass upon them, for the reason that the only thing sought to be restrained is the *purchase* of the screw couplings and there is nothing in the ordinance, nor elsehwere in the law, forbidding such purchase. If it be unlawful to use the couplings when purchased, then when the use is undertaken, it would be proper to ask for the injunction. As indicated by the preceding language, however, such application would come before the court with little likelihood of favorable action. As the matter now stands, the prayer for the injunction as prayed for in connection with the screw couplings will be denied.

It is further sought by the bill to restrain the payment of $15,000 to the Firemen's Volunteer Relief Association. It is contended that such payment would be a gratuity, the payment

54　　　　　Taylor, et al., vs. Smith, et al.

Opinion.

of which is borbidden by *Section* 8, *Article VIII*, of the Constitution of this state. The bill alleges as a fact that such payment, if made, will be a gratuity. If it be such, then it is not lawful. *Wolcott, Atty. Gen., v. Mayor, etc., of Wilmington*, 11 *Del. Ch.* 15, 95 *Atl.* 303. The defendants who have appeared consent that the preliminary injunction may issue restraining the payment of this money. The Volunteer Firemen's Relief Association was not made a party to the original bill, but is now made a party defendant by amendment. It has not yet, however, had an opportunity to appear and make defense to that part of the bill that concerns it. I must take as true for the present the allegation that the proposed payment is a gratuity, and accordingly order the preliminary injunction as prayed for, restraining the payment. The Association will, after appearing, have full opportunity to be heard and establish its right, if it has such, to the money directed by the act to be paid to it. It is elementary that no final decree can be made prejudicial to a person having a material interest in the subject-matter of the suit, unless such person be before the court as a party. The issuance of the preliminary writ will in no wise ultimately prejudice the Firemen's Association in the enjoyment of whatever rights it is lawfully entitled to under the act.

I think I have now disposed of all the points made by the bill and all the arguments advanced by the solicitors in the cause. Before concluding what I have to say, it will not be inappropriate to make some reference to an intimation made at the hearing to the effect that, if this bond issue is not permitted, the whole project of establishing a city fire department under the control of the city authorities might have to remain in abeyance until another General Assembly meets at which the law can be amended.

If this be the outcome, the result is to be deplored. With results, however, the court cannot be concerned. The sole duty of the court is to declare the law as the court conceives it to be, let the consequences be what they may. When the legislative authority, whether state or municipal, acting within the scope of its lawful power, declares what the law shall be, it is not in the power of any court by forced construction to substitute for the law as written its own conception of what the law ought to be.

I do not conceive, however, that there is anything in the pre-

sent act that constitutes an insuperable obstacle in the way of the department of Public Safety in its attempt to establish the fire department as directed by the act. However that may be, clearly entertaining the views I do as to the law governing the situation, there is no other alternative than to direct the issuance of the writ as herein indicated.

Let an order be prepared in accordance with the views herein expressed.

Note: The preliminary injunction was dissolved insofar as it restrained the carrying out of contracts for the purchase of hose, engines and trucks. See *post p.* 57.