THE WILMINGTON PARKING AUTHORITY, a Public Body Corporate and Politic, created by and exercising public powers of the State of Delaware, as an agency thereof,

*vs.*

DAVID D. RANKEN.

*Supreme Court, on Certification, June 3, 1954.*

442

SOUTHERLAND, C. J., and WOLCOTT and TUNNELL, JJ., sitting.

*Clair J. Killoran,* of Killoran & Van Brunt, Wilmington, for plaintiff.

*John J. Morris, Jr.,* and *Henry van der Goes,* of Morris, James, Hitchens & Williams, Wilmington, for defendant.

SOUTHERLAND, Chief Justice, for the majority of the court: The Wilmington Parking Authority, the plaintiff, seeks in the court below a declaratory judgment against the defendant, a taxpayer of the City of Wilmington. The issues raised concern the constitutionality of the Parking Authority Act of 1951, as amended, and the legality of the acts of the Authority taken under it.

The facts are undisputed, and are set forth in the pleadings, which form part of the certification. Upon these facts six questions of law have been framed and certified to us for answer.

The general legal and factual background of the case is as follows:

By the provisions of 22 *Del.C., Ch.* 5, any incorporated city or town is authorized to create, by appropriate action, a Parking Authority. Such an Authority is a public body corporate, and is declared to be an agency of the State, not of the municipality. It is charged with the duty of conducting research in the matter of off-street parking

facilities, and is empowered to plan, construct and maintain such facilities, and to acquire land for the purpose by purchase or eminent domain. To finance the project the Authority is authorized to issue revenue bonds, payable in not exceeding forty years, and to pledge the revenues of the Authority for their payment. It is forbidden to pledge the public credit, but any municipality establishing an Authority may appropriate to the Authority such sum as may be necessary to acquire the land upon which the parking facility is to be erected. All property of an Authority is exempted from taxation.

Any Parking Authority is also expressly empowered to lease portions of any of its garage buildings or structures for commercial use if such leasing is found to be necessary and feasible for the financing and operation of such facilities.

Ample incidental powers in aid of the main purposes of the Authority are also conferred.

The plaintiff Authority (hereinafter called "the Authority") has been created by the City of Wilmington. It has determined that its first project should be the establishment of a downtown parking facility in the heart of the central district of the City of Wilmington. It has acquired the greater part of a tract of land having a frontage of about 178 feet on Ninth Street between Shipley and Orange Streets and a depth of about 350 feet extending southerly toward Eighth Street. The tract consists of four parcels. The Authority has bought the principal parcel for the sum of $1,585,730. This purchase was partly financed by "advances" from the City of Wilmington of $934,000. It has also acquired one other parcel in the tract and is negotiating for the purchase of the other two. It appears probable that as to one of these it must have recourse to the exercise of the power of eminent domain.

The Authority has employed expert professional assistance in order to determine the size and kind of parking facility to be erected. It has been advised that the capacity of the facility cannot exceed 800 cars without affecting the free flow of traffic in the nearby streets. It has further been advised that the average annual net income from such parking alone would be about $150,000. It has also been advised that the cost of such a facility, devoted to parking only, would

be from \$3,600,000 to \$3,800,000; that the indicated return from such a facility would approximate only 4.15% upon the lower figure; and that a return of 8.5% upon the investment is required to market its revenue bonds. The Authority has accordingly determined that such a facility, i. e., one devoted to parking alone, could not be financed by the sale of revenue bonds.

Having made this determination, the Authority proceeded to consider the feasibility of leasing areas of the proposed facility for commercial purposes. It accordingly advertised for "inquiries from responsible business concerns relative to long-term leases for commercial space" in the proposed structure. It received only one response from a prospective tenant requiring space in excess of 25,000 square feet and ready to pay an annual rental in excess of \$50,000. The Authority decided that it should first attempt to negotiate a lease with "a major tenant" willing to lease an area with a rental contributing very substantially to the net income of the facility. Thereupon negotiations were opened with the Kennard-Pyle Company, which operates a large department store on Market Street in the City of Wilmington. An agreement was thereafter reached. It is embodied in a lease between the Authority and Kennard-Pyle Company dated January 7, 1954. The lease provides, inter alia, that the Authority shall erect a building for public parking containing space for retail stores and commercial uses, certain portions of which are to be leased to Kennard-Pyle at a rental fixed at a percentage of the construction cost. Other provisions of the lease will be considered hereafter.

Additional space is to be leased for offices and commercial uses.

As between public parking and commercial use of the proposed structure, the Authority's determination of the relative proportions in respect of space, revenue from rental, and total cost of the project, may be summarized as follows:

> Parking space,—61% ; leased space, 39%.
> Parking revenue, 30.5% ; lease revenue, 69.5%.
> Cost, parking area, 38.4% ; leased area, 61.6%.[1]

1. In the cost figures an "advance" of \$900,000 from the City of Wilmington is included; in the bases for the revenue figures it is excluded.

Information respecting the foregoing matters having become public, the defendant taxpayer challenged the validity of the project on numerous grounds, and informed the Authority that if necessary he would take action to resolve the legal questions involved. The suit in Chancery was then instituted.

We turn to the consideration of the certified questions. The first is as follows:

1. *"Is Chapter 5 of Title 22 of the Delaware Code of 1953, as amended, in all respects a constitutional exercise and grant of power by the General Assembly of the State of Delaware?"*

Although the question as drawn appears to call for an examination of all the provisions of the chapter, counsel have in fact limited the issues under this heading to three questions of law. These we now consider.

(a) *"Is Chapter 5, Title 22, Delaware Code, unconstitutional in that it authorizes the expenditure of funds for off-street parking facilities?"*

Defendant invokes the well-settled principle, not here questioned, that public funds may not constitutionally be appropriated for private purposes. 2 *Cooley, Constitutional Limitations,* (8th Ed.) *p.* 1033ff; *Gray, Limitations of Taxing Power, pp.* 123-127; *Loan Association v. City of Topeka,* 20 *Wall.* 655, 22 *L.Ed.* 455; *State v. Mayor and Council of Wilmington,* 33 *Del.* 238, 134 *A.* 694. An off-street parking garage, says defendant, does not serve a public purpose; such an activity is traditionally one committed to private enterprise, in which the State, under the rule above stated, is forbidden to engage; and it no more serves a public purpose than many other private businesses that cater to the convenience and comfort of the public.

The phrase "public purpose" is not susceptible of precise definition, and it is not possible to adopt any rigid rule by which to determine whether a purpose or use is to be held public or private. *Gray, op. cit., p.* 127. But it is clear that as public needs vary with the times

and with changed conditions, so an activity once thought to be strictly private may become a proper subject for public action or control. Sixty years ago no one would have suggested that a state-operated livery stable served a public purpose. At the present day, who can doubt that the grave problems created by the automobile, including parking, are a fit subject of public concern?

As a predicate for the Parking Authority Act, the General Assembly has specifically found certain facts. These include findings of the increased use of private automobiles in the business sections of cities; the necessity for the free circulation of traffic in the city streets; the serious traffic congestion in the streets, to which parking of motor vehicles upon the streets contributes; and the consequent interference with effective movement of fire-fighting equipment and the disposition of police forces in the congested district. Upon these findings the General Assembly has based the following conclusion:

"* * * therefore it is declared to be the policy of this State to promote the safety and welfare of the inhabitants thereof by the creation in incorporated cities of bodies corporate and politic to be known as 'Parking Authorities' which shall exist and operate for the purposes contained in this chapter. Such purposes are declared to be public uses for which public money may be spent and private property may be acquired by the exercise of the power of eminent domain." *22 Del.C.* § 501.

This legislative finding of public purpose is entitled to great weight. True, it is not conclusive, since the determination of what is a public purpose is ultimately a judicial question. *City of Cincinnati v. Vester,* 281 *U.S.* 439, 50 *S.Ct.* 360, 74 *L.Ed.* 950; *Gray, op. cit., pp.* 125-126. But these findings are so manifestly reasonable and justified that we do not think of questioning them. Indeed, they but spell out in logical development facts that are largely common knowledge. Off-street parking is directly related to traffic control, a subject admittedly one of public concern. When the legislature, in the exercise of the police power, seeks to remedy an admitted evil, the test of constitutionality is whether the method adopted bears a reasonable relation to the public health, safety, morals or general

welfare. And in determining this question doubts are resolved in favor of the challenged statute. *State v. Hobson,* 46 *Del.* 381, 83 *A.2d* 846. In the light of the legislative findings, which we must accept, we can only conclude that the General Assembly acted within its constitutional power in attempting to find means to remedy an admitted evil.

The decided cases in other states appear to be almost unanimous in holding that the legislature may constitutionally declare off-street parking to be a public purpose. *State ex rel. Gordon v. Rhoads,* 156 *Ohio St.* 81, 100 *N.E.2d* 225; *MacSorley v. Fitzgerald,* 359 *Pa.* 264, 59 *A.2d* 142; *Parr v. Ladd,* 323 *Mich.* 592, 36 *N.W.2d* 157; *DeLorenzo v. Hackensack,* 9 *N.J.* 379, 88 *A.2d* 511; *Barnes v. City of New Haven,* 140 *Conn.* 8, 98 *A.2d* 523. We are in general accord with the reasoning and the conclusions set forth in these opinions.

Defendant, admitting traffic congestion in the Wilmington business area to be a serious problem, suggests that the operation of the law of supply and demand would within a reasonable time relieve such congestion through the tendency of business enterprises to establish themselves in suburban and outlying areas, thus lessening traffic congestion; whereas the creation of large off-street parking facilities will tend to halt this tendency to decentralization—already apparent in New Castle County—and thus may perpetuate instead of abating the evil.

The argument may have force; but it must be addressed to the General Assembly and not to the courts. It demonstrates difference of opinion; not arbitrary or unreasonable action.

Defendant points to the sixth legislative finding, which reads:

"Such parking threatens irreparable loss in valuations of property in the City which can no longer be readily reached by vehicular traffic; * * *."

Defendant says that the legislature has made no general finding of widespread economic loss resulting from traffic congestion; the purpose of the Act is therefore to confer a benefit upon a small

part of the population, that is, property owners in congested areas, rather than the public generally. It may be admitted at once that this finding has little relation to the general public interest. But it may be disregarded, because the other findings, above outlined, are sufficient to sustain the legislative action. The benefit to the small class of property owners thus becomes a mere incident to the public benefit. An incidental benefit to private persons resulting from a project beneficial to the public does not invalidate the statute. 51 *Am.Jur.*, *"Taxation"*, § 330.

Defendant also contends that the act is one dealing with a temporary emergency, and that even if the emergency justifies legislative action, such action must be limited to the duration of the emergency. But there is nothing in the legislative findings to justify the factual basis of the argument. On the contrary, the legislative findings are based on the existence of steadily increasing traffic congestion in urban communities. He would be a bold man who would assert that the legislature could not reasonably have believed that this condition was likely to continue indefinitely. We do not regard the statute as emergency legislation, notwithstanding the use of the word "crisis" in the seventh finding—a choice of words that the Authority's counsel himself deprecates. The cases of *Block v. Hirsch*, 256 *U.S.* 135, 41 *S.Ct.* 458, 65 *L.Ed.* 865, relating to rent control, and *Vanderbilt v. Brunton Piano Co.*, 111 *N.J.L.* 596, 169 *A.* 177, 89 *A.L.R.* 1080, relating to the impairment of contract obligations, are therefore not in point.

We are of opinion that these objections of defendant must fail, and that the Parking Authority Act, so far as it determines off-street parking, standing alone, to be a public purpose, is constitutional.

(b) *"Are the provisions of 22 Del.C. § 504(a), as amended, authorizing the Authority to lease any portions of its buildings for commercial use, if such leasing is necessary and feasible to finance and operate its facilities, constitutional?"*

The applicable statutory provision is as follows:

"* * * provided, however, that the Authority shall have the power to lease space in any of its facilities for use by the lessee

for the sale of gasoline, the sale of automobile accessories, automobile repair and service or any other garage service and to lease portions of any of its garage buildings or structures for commercial use by the lessee, where, in the opinion of the Authority, such leasing is necessary and feasible for the financing and operation of such facilities. Any such lease shall be granted on a fair competitive basis."

The defendant contends that even if an off-street parking facility serves a public purpose, yet the power to lease space in such a facility for commercial uses, wholly unrelated to the public uses, so confounds private use with public use as to destroy the "public use" character of the facility as a whole. Since nearly forty per cent of the space in the proposed facility is to be devoted to commercial uses, and over sixty per cent of the cost is allocable to the leased areas, such commercial uses, says defendant, are not in any sense subordinate or incidental to the public uses; and the extent of such uses, not being subject to any limitation except economic necessity, give the project a dual character—a merger of public and private uses that cannot be separated and for which the State may not condemn private property and to which it may not devote public money.

Defendant makes the subsidiary contention that the statute contains no limit upon leasing the related uses, i. e., the sale of gasoline, automobile accessories, etc. But leasing for related uses is clearly proper, as furthering the convenience of the public and encouraging the use of the facility. *City of Toledo v. Jenkins,* 143 *Ohio St.* 141, 54 *N.E.2d* 656. Such a practice is wide-spread, and is immune to attack. It is with commercial leasing for wholly unrelated uses that we are here concerned.

As to defendant's principal contention, the Authority, admitting that the State may not condemn property or appropriate public money for private uses, replies that if the primary purpose be public in nature, the leasing for commercial purposes of a portion of its buildings, though unrelated to the public uses, does not destroy the public character of the project if it appears that such leasing is necessary to finance the project. In that event, says the Authority, the private

uses are deemed subordinate to the public ones, and, the primary purpose of the project being public, the statute is free of any constitutional infirmity.

■ The question posed by these contentions is one of considerable difficulty. It occupies a middle ground between extremes. On the one hand, there is abundant authority that the State, or a municipality, may lease for commercial purposes buildings, or surplus space in buildings, temporarily not needed for public use. Such leasing is deemed to be merely an incidental use of public property for a private purpose, and it does not destroy the public character of the project as a whole. *First National Bank of Milwaukee v. Town of Catawba,* 183 *Wis.* 220, 197 *N.W.* 1013; *Wheelock v. City of Lowell,* 196 *Mass.* 220, 81 *N.E.* 977; *Keith v. Richards,* 220 *Ky.* 201, 294 *S.W.* 1057; *Masonic Widows' and Orphans Home v. City of Corbin,* 229 *Ky.* 375, 17 *S.W.2d* 215.

On the other hand, it is equally well settled that if the sole purpose, or the "primary purpose" of the project is private, and the public benefit incidental only, the project is unconstitutional. This rule is recognized in the cases above cited. See also *State v. Town of North Miami, Fla.,* 59 *So.2d* 779 (erection and leasing of a manufacturing plant is unconstitutional); *Opinion to the Governor,* 76 *R.I.* 365, 70 *A.2d* 817 (statute authorizing leasing for commercial uses of entire project is unconstitutional; temporary leasing of a portion of the facility when not needed for public use is permitted).

But these general statements supply in themselves no sufficient test for deciding the case at bar. When public property is devoted to both public and private uses, each of which is an important element in the whole, so that the two uses are interdependent, which is to be deemed the "primary" use? This is the instant case. Clearly, it does not fall within the scope of the rule permitting temporary commercial leasing of public facilities not immediately needed for public purposes. Likewise, it is not a case where the underlying purpose of the project is to put the Authority into private business. It is a case where the Authority, charged with the duty of constructing a public improvement and forbidden to pledge the public credit, is required to lease

portions of its facility, to a very substantial extent, in order to finance the entire project. Which use is to be deemed paramount?

The situation before us appears to be a logical outgrowth of the increasing use of revenue bonds for public financing—a modern development of great importance and record of accomplishment in the field of public improvements. 8 *Am.Jur., "Public Securities and Obligations"*, § 8. Desirous of avoiding the imposition of additional taxation, the legislature determines that a proposed revenue-producing project, admittedly public in nature, must be made self-supporting. In many cases, of which public roads and bridges are the most familiar examples, the revenue is ample to liquidate the obligations incurred. In others, it is insufficient. Cases like the instant one, involving, for example, very high costs in acquiring land in urban business districts, are examples of projects that cannot be made wholly self-sustaining. In such a case, if the legislature cannot constitutionally authorize private leasing, the project must fail, or recourse must be had to the public credit.

The question, then comes to this: If the legislature determines that a public project should be self-sustaining, and if it clearly appears that leasing for unrelated commercial uses is necessary to make it self-sustaining, is such a leasing, to the extent necessary for the purpose, to be deemed a use of public property subordinate to the public use? The Authority admits that its case rests on an affirmative answer to this question.

Decided cases discussing this problem are few. The factual situation most nearly approaching our own is found in the cases involving the Inland Terminal Building in New York City. The Port of New York Authority was created pursuant to a compact between the States of New York and New Jersey to deal with the serious problem of freight transportation in the Port of New York. In 1929 it acquired a square block of land in the borough of Manhattan and proceeded to erect thereon a sixteen-story building. The basement and ground floors were designed for handling freight; the fourteen upper floors were constructed for use as store, office and manufacturing space, and are leased to private business for uses unrelated to transportation.

Questions growing out of this use of public property for unrelated private purposes came before the New York courts in three cases. *Port of New York Authority v. Lattin, Special Term, N.Y. County, N.Y.L.J.* Dec. 3, 1930; *Bush Terminal Co. v. City of New York,* 1934, 152 *Misc.* 144, 273 *N.Y.S.* 331; *Bush Terminal Co. v. City of New York,* 1940, 282 *N.Y.* 306, 26 *N.E.2d* 269. The first case was a proceeding to condemn land. The right of the Authority to condemn and its right to construct the proposed building were challenged. The Supreme Court of New York (the trial court) expressly held that it might condemn property for that purpose. Answering the contention that the construction of the upper stories was beyond the intendment of the compact, the court said:

> "The use of the upper stories of the proposed building, to my mind, is incidental and does not control the purposes for which the building is to be erected. The primary purpose of acquiring this property is for a terminal from which freight can be distributed at a minimum of cost and a minimum of inconvenience, and I think that is the controlling purpose to be taken into consideration in determining whether or not the building is within the powers and purpose of the act creating the Port Authority." *The New York Law Journal, Dec.* 3, 1930.

This holding was approved by the Appellate Division in 1934. There the plaintiff assailed the right of the Authority to enter into an agreement with the City of New York for the payment of a sum in lieu of taxes equal to the tax levied prior to the erection of the Terminal. Plaintiff also challenged the Authority's right under the compact to erect the building and lease the upper floors. The court upheld the agreement on the ground that the property was by law exempt from taxation, and appears to have based its conclusion on a finding that the leasing of the upper floors was a use incidental to the public use, and the property as a whole was devoted to public purposes. The court expressly found that since the Authority had no power to levy taxes, and since the use of the land for terminal purposes only would have been uneconomical, the Authority would have been unable to finance the project without the revenue from leasing. *273 N.Y.S. at pages* 341-342. After quoting with approval the lan-

guage from the *Lattin* case above set forth, Justice Frankenthaler said:

"As appears from Judge Townley's opinion, the real question to be determined in passing upon the power of a state to engage in private business in connection with the performance of a public function is whether the private use is incidental or paramount. This is well pointed out by the United States Supreme Court in Kaukauna Water Power Co. v. Green Bay & Miss. Canal Co., 142 U.S. 254, 12 S.Ct. 173, 35 L.Ed. 1004, where the court held that the state might sell or lease water power created by a dam constructed for the purpose of improving navigation. The court said (page 273 of 142 U.S., 12 S.Ct. 173, 177): 'But if, in the erection of a public dam for a recognized public purpose, there is necessarily produced a surplus of water, which may properly be used for manufacturing purposes, there is no sound reason why the State may not retain to itself the power of controlling or disposing of such water as an incident of its right to make such improvement. * * * The true distinction seems to be between cases where the dam is erected for the express or apparent purpose of obtaining a water power to lease to private individuals, or where in building a dam for a public improvement, a wholly unnecessary excess of water is created, and cases where the surplus is a mere incident to the public improvement and a reasonable provision for securing an adequate supply of water at all times for such improvement. (P[age] 275 of 242 U.S., 12 S.Ct. 178.) * * * So long as the dam was erected for the bona fide purpose of furnishing an adequate supply of water for the canal and was not a colorable device for creating a water power, the agents of the State are entitled to great latitude of discretion in regard to the height of the dam and the head of water to be created. (P[age] 276 of 242 U.S., 12 S.Ct. 179.) * * * Courts should not scan too jealously their conduct in this connection if there be no reason to doubt that they were animated solely by a desire to promote the public interests, nor can they undertake to measure with nicety the exact amount of water required for the purpose of the public improvement.'

"There can be little reason to doubt that the Port Authority was motivated by nothing but a desire to further the public interest and carry out the purposes of the compact and comprehensive plan when it caused Inland Terminal No. 1 to be erected. The addition of the upper floors was merely incidental. Without those floors it was impossible to construct the terminal. The dominant object of the structure was its use for terminal purposes. The Legislatures and Governors of both New York and New Jersey have indicated that they entertain the same views." 273 *N.Y.S. at pages* 344-345.

Similar questions were presented to the Court of Appeals in the last of these three cases. Chief Judge Lehman said:

"The construction of a great building, over the space used for the freight terminal, in order to obtain revenue, might transcend the powers of the Authority if the erection of the freight terminal alone would have been feasible, but the mandate and the express grant of power to the Port Authority to construct terminals include as an incident the power to use appropriate means to carry out the mandate. Acts performed in carrying out a legislative mandate, as an incident to the exercise of a general power conferred by the Legislature, are not ultra vires where they were within the contemplation of the Legislature when it granted the general power.

\*    \*    \*

"Of course, the power to construct terminals which incidentally contain 'storage space and space for other facilities' might be transcended if, under cover of that power, the Port Authority assumed to construct an office or loft building intended primarily for revenue and only incidentally for terminal purposes. The factors involved are often relative, not absolute, and the test may be one of degree. Cf. Kaukauna Water-Power Co. v. Green Bay & Mississippi Canal Co., 142 U.S. 254, 12 S.Ct. 173, 35 L.Ed. 1004." 26 *N.E.2d at page* 273.

Dealing with the matter of exemption from taxation, the court further said:

"Property held by an agency of the State is ordinarily immune from taxation only while it is used for a public purpose. Property used primarily to obtain revenue or profit is not held for a public use and is not ordinarily immune from taxation, but property held by a State agency primarily for a public use does not lose immunity because the State agency incidentally derives income from the property. Cooley on Taxation, 4th Ed., § 640; Wayland v. Middlesex County, 4 Gray, Mass., 500. Cf. People ex rel. Mayor v. Board of Assessors, 111 N.Y. 505, 19 N.E. 90, 2 L.R.A. 148. Here the evidence and the findings and conclusions of the court at Special Term establish beyond possibility of successful challenge that the use of the building above the terminal for purposes of revenue is purely incidental to the purpose of the Port Authority to operate a terminal facility at a charge which the consumer can pay. There is here no purpose to make a profit and without the use of the upper stories of the building for revenue the public purpose could not be carried out." 26 N.E.2d at page 276.

It is true that the principal question considered by the Court of Appeals appears to be the power of the Port of New York Authority under the compact to construct the terminal. But the question of the mingling of public and private uses is specifically dealt with. And the opinion of the Appellate Division seems to be a clear holding that to the extent private leasing of a public facility is necessary to finance the erection and maintenance of the facility it is lawful, and does not offend against the principle of constitutional law that forbids the State to engage in private business with public funds.

The recent case of Shizas v. City of Detroit, 333 Mich. 44, 52 N.W.2d 589, 590, relied on by defendant, does not, on analysis, conflict with the New York cases. A Michigan statute authorizing cities to acquire and operate parking facilities contained a provision permitting the leasing of any portion of the ground and basement floor space, not exceeding 25 per cent of the total floor area of the entire structure, "if it [the city] shall deem such leasing to be beneficial in connection with the acquirement and/or operation of such facilities." The City Council of Detroit created a parking authority, which sub-

mitted a plan for the condemnation of land and the construction of a parking facility accommodating 780 cars and 22 stores on the first floor to be rented to produce revenue. The Council authorized the project, condemnation proceedings were brought (or threatened), and a taxpayer of Detroit, also a lessee of property within the area sought to be condemned, sued to enjoin the condemnation. The Supreme Court of Michigan held that the power of eminent domain may not constitutionally be employed to condemn property to be used for private purposes; and that if the use to which the property is to be put is partly public and partly private, and the two purposes cannot be separated, the entire condemnation must fail. Since the provisions of the statute authorized the taking of property for both purposes, the purposes were so interwoven that they could not be separated. The statute was accordingly held to be unconstitutional.

The facts disclosed in the opinion, and the reasoning of the court, distinguish the *Shizas* case from the case at bar on a vital point. Not only was there no contention by the City that the revenue from leasing was necessary to finance the project, but the figures submitted by the parking authority indicated that the expected revenue from parking was more than sufficient to finance the project.[2] The court said:

> "It may be noted also in this connection that while the revenue from the rents derived from the stores is to be credited to the facility, no claim is made that the public project cannot be effectuated without the obtaining of revenue therefor in the manner indicated [private leasing]".

On this ground, among others, the court distinguished the *Bush Terminal Case, 282 N.Y. 306, 26 N.E.2d 269*, saying, with respect to the opinion of the Court of Appeals:

> "The court in its opinion pointed out the economic benefits resulting to the public from the construction of inland terminals, and that the revenue from each such project was required to be

2. The estimated cost was $3,221,000; the expected parking revenue $370,900; and the estimated "operating cost" (which appears to include debt service) $293,800.

sufficient to pay the expense of operation and maintenance as well as the interest and sinking fund requirements of the bonds issued." *52 N.W.2d at page* 595.

It is also to be noted that the Michigan statute, unlike ours, did not limit the area of commercial leasing to such amount as might be *necessary* to finance the project.

The *Shizas* case cannot, therefore, be regarded as opposed to the holding that we have drawn from the Inland Terminal cases in New York, namely, that to the extent that leasing for private uses is necessary to finance a public project that must be self-liquidating, the private use is deemed to be incidental to the public one. Indeed, the language of the court above quoted may be read as implying that if commercial leasing had been necessary to finance the project, a different conclusion would have been reached.

Before accepting the test of economic necessity in the financing of public projects through commercial leasing, we must examine, first, the implications of this rule, and second, whether any alternative rule is preferable.

When the possible results of this rule are considered, the effect is somewhat disturbing. It may be said with some force that if no curb but economic necessity is imposed upon use of public property for private business, the whole field of private enterprise is subject to invasion by the State under the guise of financing all public improvements through revenue bonds, and obtaining the necessary money by engaging in any profitable business whatever. And, indeed, it is hard to see "where the line can be drawn". But differences in degree are important in the law, and if no differences in degree can be found in respect of the relative quantities of space allocable to private uses, or in the relative amounts of revenue to be derived therefrom, it does not follow that differences in other respects may not be decisive.

As to the apprehensions arising from extreme illustrations there is this to be said. First, the reviewing court must be satisfied that the underlying purpose—the motivating desire—of the public authority is the benefit to the general public. If a self-styled public project

is so designed that in fact private interests are the chief beneficiaries, a remedy is available. Such a case was that of *Denihan Enterprises, Inc. v. O'Dwyer*, 302 *N.Y.* 451, 99 *N.E.2d* 235. Plaintiff charged that a municipal parking project had been so designed that out of 325 car spaces, only 17 would be available to the general public, the rest being assigned to the tenants of a proposed lessee of the project, the lessee being the owner of an apartment house across the street. The court held that the complaint presented triable issues.

Second, approval of a project such as the one before us does not necessarily carry blanket approval of every case of "economic necessity". The project before us is like the Inland Terminal in New York, "a single self-sustaining governmental unit". *273 N.Y.S. at page* 348. The two uses of a proposed structure are, as we have noted, interdependent. Sufficiently different situations in this respect might lead to a different result. We do not speculate upon the possibilities; we merely say that the use of commercial leasing in these cases is not without probable limitations.

But even if adoption of the rule of "economic necessity" is not wholly satisfying, yet what is the alternative? Commercial leasing of public property, in itself, is not necessarily unconstitutional. Certainly we could not hold that no such leasing whatever is permissible. In the instant case, if the project included only the leasing of a few offices or stores on the first floor, in order to make the best use of the most valuable space, would it not be clear that such leasing was "incidental" to the public uses? And if some such leasing is permitted, how limit the quantity? Surely the distinction between "primary" and "subordinate" uses cannot depend upon a mathematical ratio of leased space to total space, or upon a ratio of lease revenue to total revenue.[3] How is such a proportion to be determined? Certainly the court cannot do it. Nor is it a satisfactory answer, we think, to say that such a proportion must be a reasonable one. How can a public body find a safe guide in such a rule? Some other test must

3. Information supplied to the Court by counsel indicates that in 1934 nearly 98% of the revenues of the Inland Terminal Building in New York were derived from commercial leasing.

be found. The only other test appears to be that embodied in the statute.

One final observation may be made. The fact is—and it is a commonplace—that the recent years have seen a very great expansion of governmental activity in fields formerly believed to be reserved for private enterprise. In passing upon the constitutional questions presented by these undertakings the prevailing attitude of the courts has been (to paraphrase the language of Mr. Justice Brown in the *Kaukauna case, supra,* 12 *S.Ct. at page* 179) that they should not scan too jealously the conduct of public bodies in such matters if there be no reason to doubt that they were animated solely by a desire to promote the public interests. No doubt the breadth of the concept of public purpose has increased and is increasing, but it requires an extreme case for a court to say that it "ought to be diminished".

In the light of the foregoing discussion, we think that the test prescribed by the statute, and urged by the Authority is the correct one. Since the dominant or underlying purpose of the contemplated project subserves a public use, commercial leasing of space therein for uses unrelated to the public use is permitted to the extent, and only to the extent, that such leasing is necessary and feasible to enable the Authority to finance the project.

(c). *"Are the provisions of 22 Del. C. § 508, as amended, authorizing municipalities to appropriate money to a parking authority for the acquisition of the land upon which the parking facility is to be built, unconstitutional?"*

The last paragraph of § 508 provides:

"Any municipality establishing an authority under this chapter may, under such terms and conditions as it may deem appropriate, provide for and pay to such authority such sum or sums of money necessary to acquire in whole or in part the lands upon which such authority may undertake to erect a parking facility as herein provided; the municipality for the purpose of providing said money may issue its general obligation bonds secured by the faith and credit of the municipality. The aggregate amount

of general obligation bonds issued by a municipality under this provision shall be in addition to and not within the limitations of any existing statutory debt limitation of the municipality."

Such an appropriation, says defendant, is forbidden by the provisions of *Art. VIII, Sec. 8, of the Delaware Constitution,* which provides:

> "No county, city, town or other municipality shall lend its credit or appropriate money to, or assume the debt of, or become a shareholder or joint owner in or with any private corporation or any person or company whatever."

Defendant says, first, that the word "municipality" in this section should be construed to include any public body corporate; and second, that in any event the use of municipal funds to erect a building to be leased to private persons is an appropriation for the benefit of such persons, and is forbidden.

The Authority is declared by the Act to be a public body corporate, exercising public powers of the State as an agency thereof, but in no way to be deemed an instrumentality of the city or engaged in the performance of a municipal function. *22 Del.C.* § 504(a). Thus the appropriation is not made directly or for the benefit of a private corporation. But the prohibition contained in *Art.* VIII, *Sec.* 8 *of the Constitution* should not receive too narrow a construction. Clearly, if the public body receiving the appropriation were a mere channel through which public money were to be invested in a private corporation, thus making the City a creditor or stockholder of such a corporation, the transaction would be illegal.

But that is not this case. The evil forbidden by the constitution is not the investment of municipal funds in a public project operated solely by the municipality or other public body. "It forbids the union of public and private capital or credit in any enterprise whatever." *Walker v. City of Cincinnati,* 21 *Ohio St.* 14, 8 *Am.Rep.* 24, 38. And the history of the adoption of these or similar constitutional provisions in the various states, following widespread de-

faults on railroad securities guaranteed by municipalities, shows that the provision was not intended to prevent a municipality from devoting funds to its own public improvements. See 1 *Cooley, Constitutional Limitations, pp.* 463-469; 1 *Dillon, Municipal Corporations, (5th Ed.) pp.* 569-580; *Walker v. City of Cincinnati, supra.* And the *Debates of the Constitutional Convention of* 1897 confirm this construction. See, for example, *Vol. 6, pp.* 4176-4201.

Since there is no suggestion of any union of public and private capital in the proposed project, this objection must fail.

With respect to Question 1, therefore, our conclusion is that those portions of the act above discussed are constitutional.

Question 2 is as follows:

*"Has the plaintiff Authority, in acting pursuant to the aforesaid Act, as to the project which it has planned, as described in the Complaint, acted in accordance with and not beyond the powers granted by the Legislature?"*

We construe this question as one concerning the power of the Authority to determine upon and plan the kind of facility which is described in the complaint and heretofore discussed, namely, a parking facility in which approximately forty per cent of the space will be leased for commercial uses, and about seventy per cent of the revenue will be derived therefrom. These features of the project are the ones assailed by defendant under this heading. Questions touching the requirement of competitive bidding and the validity of the Kennard-Pyle lease are later considered. It is also to be noted that defendant disclaims—and we think properly—any intention to attack the good faith of the officials' acts.

Defendant contends that the amount of space devoted to commercial leasing is so large in proportion to the total as to make the public purpose subordinate to private uses.

With this objection, in another form, we have already dealt. Since we have held that the provisions of the Act permitting com-

mercial leasing may be availed of to the extent necessary to finance the project, it must follow that the Authority acted within the law.

This objection must likewise fail.

Question 3 is as follows:

*"If the Authority has acted within the scope of the powers granted to it by the Legislature in reference to the project described in the Complaint, will the land which it has purchased and intends to purchase, and will the buildings which it proposes to erect thereon, as to the whole thereof, be free from ad valorem taxation as provided by the Act, and will the revenue bonds which it proposes to issue to finance the construction thereof be free from taxation as provided by the Act?"*

*22 Del.C.* § 514 provides:

"The effectuation of the authorized purposes of the Authorities created under this chapter shall and will be in all respects for the benefit of the residents of incorporated cities for the increase of their commerce and prosperity, since such Authorities will be performing essential governmental functions and for the improvement of their health, safety, and living conditions, and, in effectuating such purposes, such Authorities shall not be required to pay any taxes or assessments upon any property acquired or used by them for such purposes. In lieu of such taxes or special assessments an Authority may agree to make payments to the city or the county or any political subdivision. The bonds issued by any Authority, their transfer and the income therefrom, including any profits made on the sale thereof, shall at all times be free from taxation within this State."

The power of the General Assembly to grant exemption from taxation is contained in *Art.* VIII, *Sec. 1, of the Constitution,* which provides:

"All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws, but the

General Assembly may by general laws exempt from taxation such property as in the opinion of the General Assembly will best promote the public welfare."

Our organic law, unlike the constitutions and statutes of many of our sister states, does not expressly limit tax exemption to property devoted to public uses. The General Assembly is given wide discretion in determining what property shall be exempt and to what extent it may be exempted. Defendant suggests that an implied limitation on this power should be read into Section 8, restricting the power of exemption of the General Assembly to property actually used for public purposes. So much of the Authority's property as is devoted to commercial leasing, says defendant, is not devoted to public uses, and may not be exempt from taxation.

But we cannot so limit the language of the Constitution. Not only is its meaning clear on its face, but a reading of the *Debates* of the 1897 Convention refutes the suggestion that any such limitation was intended. The *First Report of the Committee on Revenue and Taxation* embodied a draft of Section 1 of a proposed Article dealing with that subject, which contained the following provision with respect to exemption:

> "* * * The General Assembly may by general laws exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit."

After discussion, this language was rejected as undesirably narrow, and the section was redrafted and adopted in its present form. See the *Debates, Vol. 6, pp.* 3675-3752.

The General Assembly has frequently exercised its power to exempt property not held or used for strictly public purposes. See the provisions of 9 *Del.C., Ch.* 81.

We need not go so far as to say that the power of the Legislature in this regard is wholly unlimited. But it is certainly very broad. And we are clearly of opinion that in enacting the provisions of § 514

above quoted the General Assembly acted within its constitutional powers.

Defendant builds a subsidiary argument upon the language of the statute. The exemption granted, says defendant, is for property used for "the authorized purposes" of the Authority, i. e., parking alone, and does not apply to other purposes. Exemption, says defendant, should be narrowly construed, and the statute should be read in the light of the exemptions granted in respect of state-owned property, from which property "held by way of investment" is excluded. 9 *Del.C.* § 8103. As to the revenue bonds to be issued, defendant argues that since it is impossible to allocate parking revenue to the payment of individual bonds, all the bonds are fully taxable.

This argument defeats itself. It is based upon a supposed intent of the legislature to limit the scope of the exemption. But there can be no doubt whatever of the intention to exempt the bonds in toto, and this intention is necessarily, under defendant's own reasoning, wholly inconsistent with any legislative intention to distinguish in respect of tax exemption between the parking and the leased areas. Moreover, the "authorized purposes" of the Authority, include, by the express terms of the Act, the leasing of a portion of its facility.

We find no substance in this argument.

We accordingly hold that all property of the Authority, and the bonds to be issued by it, is exempt from all taxes imposed within this State.

Question 4 is as follows:

*"Is the Authority empowered, generally and specifically, with reference to the properties which it has not yet acquired within its planned project site described in this Complaint, to exercise the power of condemnation conferred upon it by the Act?"*

The answer to this question is found in the discussion of Question 1 above. The applicable principle of law is, as in the case of taxation, that the proposed use of property to be acquired by

eminent domain must be a public one. *Clendaniel v. Conrad, 3 Boyce* 549, 590, 83 *A.* 1036, *Thompson v. Hillcrest Ass'n, 39 Del.* 590, 5 *A.2d* 236. Since we have held the purpose of the project as a whole to be a public one, the answer must be in the affirmative.

Questions 5 and 6 may be conveniently discussed together. They are as follows:

> 5. *"Does the basis upon which the Authority entered into the Kennard-Pyle lease and does the basis upon which the Authority proposes to negotiate other leases of commercial space, as described in the pleadings, satisfy the requirements of leasing on a 'fair competitive basis' within the language of Section 504(a) of the Act, as amended by Chapter 72, Volume 49, Laws of Delaware?"*

> 6. *"Is the execution of the Kennard-Pyle lease, referred to and incorporated as Exhibit 'D' to the Complaint, in all respects a lawful exercise by the Authority of the powers conferred upon it by the Act?"*

We have heretofore quoted the provisions of 22 *Del.C.* § 504(a) relating to leasing for commercial use. The last sentence of subsection (a) reads:

> "Any such lease shall be granted on a fair competitive basis."

The defendant contends that the Authority has not complied with the statute. The statutory requirement, says defendant, is clearly similar to a requirement that leases shall be granted as a result of competitive bidding, that is, under conditions that invite the making of bids on a footing of equality and with reference to some standard made known to all prospective bidders. This, says defendant, the Authority did not do; what it did amounted in effect to nothing more than private negotiation.

The statute contains no specification of the procedure to be followed to insure competition in connection with the granting of

leases. But the import of the phrase, "a fair competitive basis", is clear. There must be compliance with the minimum requirements of competitive bidding. Such requirements in connection with the letting of public contracts are deeply embedded in American statutory law. Apart from special statutes, there are certain well-settled principles by which the courts test the acts of public officers in letting public contracts under laws requiring competitive bidding.

In 10 *McQuillin, Municipal Corporations,* § 29.30, *p.* 268, the author says:

> "The requirement of competitive bidding in the letting of municipal contracts is uniformly construed as mandatory and jurisdictional and non-observance will render the contract void and unenforcible. Under such restriction a fair opportunity must be given for free competition. No scheme or device promotive of favoritism or unfairness or which imposes limitations, not applicable to all bidders alike, will be tolerated."

Cf. *Taylor v. Smith,* 13 *Del.Ch.* 39, 115 *A.* 405.

*McQuillin* also says, § 29.44, *p.* 297 of the same volume:

> "The request for bids must not unduly restrict competition. All persons or corporations having the ability to furnish the supplies or materials needed, or to perform the work to be done, should be allowed to compete freely without any unreasonable restrictions."

And again, § 29.52, *p.* 312 of the same volume.

> "In order to attain competitive bidding in its true sense, proposals for bids must be invited under circumstances which afford a fair and reasonable opportunity for competition. Consequently it is essential that the bidders, so far as possible, be put on terms of perfect equality, so that they may bid on substantially the same proposition, and on the same terms."

The quoted language has particular reference to contracts for the construction of public projects; but the stated principles apply

with full force to all public contracts subject to the requirement of competitive bidding.   10 *McQuillin, op. cit.,* § *29.28, p. 263.*

And finally, § *29.56, p.* 319 of the same volume:

"In order that unrestricted competition may be had, it is necessary that some standard be adopted for the guidance of all the bidders.   Where, therefore, the plans and specifications are left to the discretion of the individual bidder and submitted with his bid, the effect is to stifle competition and is a violation of the requirement to let the contract to the lowest bidder."

In *Sterrett v. Bell, (Tex.Civ.App.,* 1951) 240 *S.W.2d* 516, 520, the court stated the essential elements of competitive bidding as follows:

" 'Competitive bidding' requires due advertisement, giving opportunity to bid, and contemplates a bidding on the same undertaking upon each of the same material items covered by the contract; upon the same thing.   It requires that all bidders be placed upon the same plane of equality and that they each bid upon the same terms and conditions involved in all the items and parts of the contract, and that the proposal specify as to all bids the same, or substantially similar specifications. * * *' "

Further discussion of the authorities is unnecessary.   We think that the language of the Parking Authority Act is to be construed in the light of these principles.   The Authority is not restricted to any particular procedure; but whatever procedure is followed, it must not unduly restrict competition, must place all bidders on an equal footing, and must require the bids to be based upon some standard applicable to all.

Did the actions of the Authority meet these requirements?   Let us examine what was done.

On July 30 and 31, 1953, the Authority caused to be published in the two principal daily newspapers of the City of Wilmington the following notice:

"Public Notice

"The Wilmington Parking Authority will receive inquiries from responsible business concerns relative to long-term leases for commercial space in the parking facilities which the Authority proposes to construct at Shipley and Ninth Streets, Wilmington Delaware.

"Inquiries must be in writing addressed to The Wilmington Parking Authority, Temporary Rental Office, 909 Tatnall Street, Wilmington, Delaware.

"Edwin F. Koester, Chairman."

On August 17, 18, 19 and 20, 1953, the following notice was published in the same newspapers:

"Final Notice

"The Wilmington Parking Authority will receive inquiries from responsible business concerns relative to long-term leases for commercial space in the parking facilities which the Authority proposes to construct at Shipley and Ninth Streets, Wilmington, Delaware.

"Inquiries must be in writing addressed to The Wilmington Parking Authority, Temporary Rental Office, 909 Tatnall Street, Wilmington, Delaware. Only such inquiries postmarked on or before August 24, 1953, will be considered by the Authority.

"Edwin F. Koester, Chairman."

The "final notice" was also published in the Wilmington Sunday Star of August 16, 1953.

On December 2 and 3, 1953, *after* the tentative agreement with Kennard-Pyle heretofore referred to, the Authority inserted, in the same two daily papers, the following notice:

"Public Notice

"The Wilmington Parking Authority will consider applications for a limited amount of office space on the upper floors of

the parking facility it proposes to erect at 9th and Shipley Streets. Address inquiries to The Wilmington Parking Authority, Temporary Rental Office, 909 Tatnall Street, Wilmington, Delaware."

We observe that the earlier notices were limited to inquiries for long-term leases; the last notice contained no such restriction.

Considered in the light of the established requirements for competitive bidding, these notices were wholly insufficient as a basis for competitive bidding. Although the Authority's brief refers to them as "Ads inviting inquiry *and proposals*", they were nothing more than invitations to ask questions. Obviously no definite proposal or bid could be based upon such a notice. No information was given in the first two notices of the size or character of the building to be erected or of the uses to which the leased space might be put. In none of the notices were any plans or specifications referred to or stated to be available to prospective bidders.

Moreover, the bidding field was originally circumscribed by the restriction as to "long-term leases". The use of the elastic phrase "long-term leases", which was not defined, may well have discouraged prospective bidders from making inquiries that the notices invited.[4]

We do not mean to say that the Authority in inviting bids could not have imposed conditions in respect of the length of the leases. But such conditions must be sufficiently definite to enable prospective tenants to bid intelligently and in competition.

What the Authority actually did was to invite private negotiations. The steps taken after August 24, 1953 (the "cut-off date" in the second notice), and before the publication of the third notice, are best described in the Authority's own words in the complaint, as follows:

"(14) In response to said advertisements the Authority received 33 inquiries from those parties listed on Exhibit 'C', of

---

4. The complaint avers that in response to all of the advertisements the Authority received 33 inquiries. How many of these were received in response to the first two notices does not appear.

which only one represented an inquiry from a tenant having need for space in excess of 25,000 square feet, and prepared to pay a rental in excess of $50,000.00 annually. The Authority determined that for the purpose of exploring the feasibility of financing the construction of the facility, it should first attempt to negotiate a lease with a major tenant who would be willing to lease an area with a rental in dollar amount which would contribute very substantially to the net income of the facility. The Authority's decision was dictated by the consideration that the obtaining of a definitive lease with a financially responsible tenant would determine in large measure: (a) the feasibility of financing the entire project, and (b) the general outlines of the type of structure which would be required.

"Pursuant to such determination, the Authority instructed its consultants to enter into negotiations with the only applicant for a substantial amount of space which would yield a substantial net income. In accordance with such instructions, negotiations were opened with The Kennard-Pyle Company, the operator of a large department store then and now located at 617 Market Street in Wilmington, Delaware.

"As a necessary corollary to this determination and as an inherent requirement in said negotiations, the Authority instructed its architects and engineers to prepare preliminary plans for a building which could meet the basic requirements of the Authority as to at least 800 car spaces without undue blocking, and at the same time meet the indicated requirements of the prospective tenant.

"As a result of these negotiations, the representatives of the Authority and the officials of The Kennard-Pyle Company reached a tentative agreement as to the amount, location and character of space which would be provided and the terms under which The Kennard-Pyle Company would lease said space."

The plain fact is that the Kennard-Pyle lease before us is the result of private negotiation and not of competitive bidding. This the statute forbids. The Authority, we think, fell into the error of assuming that if the lease was a sound business-like method of making

its revenues secure, the procedure by which it was obtained was of little consequence. But it is of the essence of a valid letting of a public contract under competitive bidding that any advantage that may sometimes exist in the method of private negotiation must yield to the considerations of public interest embodied in the requirement for competition. It is not an answer to say that the public officials acted in good faith and made a good bargain; they must show compliance with the law.

We do not read the Authority's brief as contending to the contrary. The argument seems to be (though it is not wholly clear to us) that the notices preceding the negotiation for the lease were sufficient in law to constitute proposals for competitive bidding. We are clearly of opinion, for the reasons stated, that they were insufficient. The Kennard-Pyle lease must be held invalid.

The notices of December 2 and 3 likewise failed to contain sufficient information to enable prospective tenants to bid. Moreover, they were obviously limited in respect of available space, and were thus predicated upon the assumption of the validity of the Kennard-Pyle lease. They were also insufficient in law.

Counsel for defendant makes several contentions directed to the validity of certain specific provisions of the Kennard-Pyle lease. These contentions we think we should deal with, in order that as to these matters the Authority may have some guide for the future.

■ (1) It is said that the lease requires the drawings for the lessee's portion of the building to be approved by the lessee's architect and the break-down of contract costs must also be approved by him. By these provisions, says defendant, the Authority has relinquished control of a part of its duties under the Parking Authority Act.

We do not think so. The Authority is not bound to agree to Kennard-Pyle's determination of these matters; it retains the right to disagree with them. True, a hopeless disagreement might result in a loss of the contract; but that does not involve a relinquishment of the Authority's responsibility. The provision is merely designed to afford a reasonable protection of the lessee's interests.

(2) Defendant contends that the lease, being indefinitely renewable at the option of the lessee, is beyond the power of the Authority; and the continuance of the stipulated rent during the indefinite periods of renewal is improvident and unreasonable.

Paragraph 2 of the lease fixes its terms at forty years. Paragraph 7, however, provides for an unlimited number of extensions of ten years, and thus grants the lessee, at its option, a lease in perpetuity. Such a grant, defendant contends, is *ultra vires*.

We think this objection is well taken. The duration of a contract let by a municipality must, in the absence of statute, be reasonable, having regard to the circumstances. 10 *McQuillin, Municipal Corporations,* § 29.100. We think this rule applicable to the Authority, since, although not strictly a municipal corporation or an agency of the City, it is a public body with limited powers specifically set forth in the Act, whose property will ultimately belong to the City of Wilmington. Nowhere is the Authority vested with power to grant leases in perpetuity. Its own corporate existence is limited to fifty years, after which the Act appears to contemplate that its property shall be conveyed to its creator, the City. § 504(*b*) (1), § 513. And after all outstanding bonds have been paid, it may convey all its property to the City and terminate its existence. § 513.

Municipal contracts of perpetual duration are not necessarily invalid, 10 *McQuillin, op. cit.,* § 29.102, but under some circumstances may be so unreasonable as to be *ultra vires*. 63 *C.J.S., Municipal Corporations,* § 979, *p.* 534; 38 *Am.Jur., "Municipal Corporations",* § 498; *Westminster Water Co. v. Mayor of Westminster,* 98 *Md.,* 551, 56 *A.* 990, 64 *L.R.A.* 630; *City Council of Augusta v. Richmond County,* 178 *Ga.* 400, 173 *S.E.* 140.

One of the important circumstances here is the limited life of the Authority. The proposed lease has the effect of fastening upon the City, after the life of the Authority has ceased, a lease of valuable real estate, perpetual at the lessee's option, at a rental fixed at a percentage of construction costs determined at the time the building is erected.[5] Such a rental, or indeed any rental fixed at the time of the

5. Seven per cent of such costs for 22 years; four per cent thereafter.

erection of the building, might be grossly inadequate after a lapse of fifty years. The City cannot, in the absence of legislative sanction, be stripped of its power over the property it will then own.

We think that the provision of the lease that gives the lessee the option to extend its term beyond the corporate life of the Authority is unreasonable and void.

■■■ (3) Defendant assails the provision in the lease requiring the Authority to pay any taxes that may be assessed against the Authority's property. Although the property is now exempt, the legislature may withdraw the exemption; in which case, says defendant, the lessee should pay the taxes so levied.

Defendant cites *Consolidated Fisheries Co. v. Marshall*, 42 *Del.* 283, 32 *A.2d* 426, affirmed on opinion below, 42 *Del.* 532, 39 *A.2d* 413. This case involved primarily a question of statutory construction, that is, whether the General Assembly had authorized the Town of Lewes to tax improvements made by lessees on leased lands. The question here is whether, in leasing the improvement, the Authority may agree to assume the payment of any taxes that may hereafter be assessed against such improvement. We see no reason to doubt its power in this regard. Certainly if the Authority refused such a covenant, the lessee would have to take into account its possible liability for such taxes. Moreover, the owner of the improvement is normally the person to pay the tax. The building belongs to the Authority, and there is no principle of law or of public policy that we know of that would forbid it to agree to pay that for which it would normally be liable.

(4) Defendant's last objection to the lease is directed to a provision that during its term the Authority will not lease more than 6,000 square feet of floor space to any other tenant for occupancy for the sale of merchandise that will be in competition with lessee's business. By this provision, says defendant, the Authority has granted away its right and duty to grant leases on "a fair competitive basis"; hence such a clause is in violation of the Act and is invalid.

If the lease forbade any leasing whatever to a competitor of Kennard-Pyle, a serious question would be presented, that is, the

right of the Authority to limit the field of competitive bidding by an absolute exclusion of a class of prospective tenants of the additional space to be offered for rental. But the prohibition is a limited one. The Authority may lease up to 6,000 square feet to a competitor of Kennard-Pyle. The effect, if any, that this would have in limiting competitive bidding for the additional space cannot be determined upon the record before us. Whether it would unreasonably limit it is a question of fact, depending upon a variety of circumstances, such as the probable demand for space in excess of 6,000 square feet, the feasibility of competing with Kennard-Pyle in a store of less than 6,000 square feet of floor space, and so on.

Since the objection presents a question of fact upon which the record is silent, we cannot consider it.

The foregoing discussion of the specific terms of the lease deals only with the objections made by the defendant. We have made no attempt to consider what other provisions of the lease, if any, are vulnerable.[6]

Our conclusion is that the Authority has not complied with the requirement for competitive bidding, and that the Kennard-Pyle lease is invalid.

Order answering the certified questions in accordance with the foregoing opinion.

TUNNELL, Justice (dissenting):

I am in complete accord with the finding of my colleagues that in so far as this law authorizes a state agency to establish and operate a needed automobile parking facility, it does not offend against any constitutional principle. I also agree that *Art.* VIII, *Sec.* 8, *of the Constitution,* which forbids public agencies to invest in private corporations, has no application to the instant project. Our difference arises only when the parking proposal is coupled with a plan for the

---

6. E. g., query as to paragraph (5). This is a provision requiring the Authority to sublet from its own lessee, on a month to month basis, such part of the lessee's space as may be suitable for parking purposes, although we are told that a total of 800 cars is all that can be efficiently accommodated.

public agency also to enter into a business venture designed to make profits to offset the anticipated deficits of the parking facility.

The statement of facts in the majority opinion will not be repeated here.

The issue between us being fundamental in character, a discussion of it properly begins with fundamentals.

The preamble to the constitution declares that all men, "Through Divine goodness" and "by nature," are vested with the right of "acquiring and protecting" property.

Under a system of government which attempts to protect property, the right to take property away from individuals by the devices of eminent domain and taxation is a matter of such delicacy that certain limitations are of necessity engrafted upon their use. Some of these limitations have been expressed in constitutions; some are merely implied. Yet the latter class are no less firm than the former, for it is often because they are indispensable that they have simply been taken for granted.

It appears to me that the right to prevent private persons from being squeezed out of their means of livelihood by a concern possessing the unique power to tax its competitors in order to assure its own survival is so essential to our concept of private property that it is, therefore, one of those limitations which literally underlie our constitution.

In Delaware, in respect to eminent domain, what the constitution expressly says is this, *Art. I, Sec.* 8:

"* * * nor shall any man's property be taken or applied to public use without the consent of his representatives, and without compensation being made."

It is apparent that this language follows upon two underlying assumptions: (1), that the government has the power to take private property, and (2), that it may be so taken only for a public purpose.

The reasons for assuming that tax money is a trust fund which may be spent only for public purposes are the same as those limiting the use of eminent domain. 51 *Am.Jur., p. 375.*

The finding that the construction of a facility to accommodate parked automobiles does not offend against the constitution is based upon affirmance of the finding that such a facility would in the circumstances be in the public interest and for a public purpose. But it is not even contended that the public interest requires any more space than we already have, or than private capital will provide, for offices and stores. Nor is there a claim that the leasing of space to particular tenants is in any way tied to the success of the parking project, as might be the case, for instance, if public use of the building for parking had to be encouraged by providing rental space for automobile supply and repair shops, gasoline stations, and the like. Ours is a plain case, therefore, where the only justification for calling the rental portion of this particular real estate investment a public use is that the public will get the profit from it. This argument has a seeming plausibility about it because the word "public" appears in two places. But is that enough?

Traditionally it has been assumed that making money, of and by itself, was an activity reserved to private enterprise, and respectable authorities have so stated. *Cooley's Constitutional Limitations,* (8th Ed.) *Vol.* II, *p.* 1118, *n.* 1, in reference to the power of eminent domain, says:

> "Property of individuals cannot be appropriated by the State under this power for the mere purpose of adding to the revenues of the State."

Justice Wood, in *Buckingham v. Smith,* 10 *Ohio* 288, 297, speaking for the Supreme Court of Ohio on the subject of eminent domain, said this:

> "The principle is founded on the superior claims of a whole community over an individual citizen; but then in those cases only where private property is wanted for *public use,* or demanded by the *public welfare.* We know of no instances in which

it has, or can be taken, even by state authority, for the mere purpose of raising a revenue by resale, or otherwise, and the exercise of such a power would be utterly destructive of individual right, and break down all the distinctions between *meum et tuum,* and annihiliate them forever, at the pleasure of the state."

And in our own jurisdiction, Judge Rodney's opinion in *Thomison v. Hillcrest Athletic Ass'n,* 9 W.W.Harr. 590, 594, 5 *A.2d* 236, 238, so far as it goes, seems to be in harmony with these statements. He there said:

"While private property is liable to be taken for a public use the owner may refuse to part with the property if intended for a private use and so it is that neither the State itself nor any designated agency may take property as for a public use when in reality it is intended to again convey the property for a private use."

It is obvious that both resales and leases could be profitable to the state, and both types of transaction are certainly conveyances to private use, so it seems clear that the mere prospect of a profit to the state has not heretofore been regarded as establishing that a particular use is public. It would be a fine distinction indeed to say that condemnation for resale, which is universally held improper, is bad, but that condemnation for leasing is allowable.

As to the federal authorities, the case of *Kaukauna Water-Power Co. v. Green Bay & M. Canal Co.,* 142 *U.S.* 254, 12 *S.Ct.* 173, 35 *L.Ed.* 1004, while involving interpretation of the 14th Amendment to the Federal Constitution, which is not here raised, nevertheless, turned upon the question of public use as against private use in a factual situation of alleged excessive taking, and it is, therefore, helpful.

The State of Wisconsin, in order to improve navigation, had taken over the bed, the banks, and the water of a river. The large dams required to assure navigability in the driest season afforded a huge head of potential power at other seasons, so Wisconsin undertook to lease this water power to manufacturers. Private power com-

panies assailed all the power aspects of the scheme as an unwarranted invasion of their property rights. Under these facts, Mr. Justice Brown, speaking for the majority of the Supreme Court of the United States, said, 12 *S.Ct. at pages* 177-179, this:

> "The improvement of the navigation of a river is a public purpose, and the sequestration or appropriation of land or other property, therefore, for such purpose, is doubtless a proper exercise of the authority of the state under its power of eminent domain. Upon the other hand, it is probably true that it is beyond the competency of the state to appropriate to itself the property of individuals for the sole purpose of creating a water-power to be leased for manufacturing purposes. This would be a case of taking the property of one man for the benefit of another, which is not a constitutional exercise of the right of eminent domain. But if, in the erection of a public dam for a recognized public purpose, there is necessarily produced a surplus of water, which may properly be used for manufacturing purposes, there is no sound reason why the state may not retain to itself the power of controlling or disposing of such water as an incident of its right to make such improvement. * * *

> "The true distinction seems to be between cases where the dam is erected for the express or apparent purpose of obtaining a water-power to lease to private individuals, or where, in building a dam for a public improvement, a wholly unnecessary excess of water is created, and cases where the surplus is a mere incident to the public improvement, and a reasonable provision for securing an adequate supply of water at all times for such improvement. No claim is made in this case that the water-power was created for the purpose of selling or leasing it, or that the dam was erected to a greater height than was reasonably necessary to create a depth of water sufficient for the purposes of navigation at all seasons of the year."

It may seem strange to us, in the light of modern developments, that the sale of water power even at that time could not have been

justified on the facts as a public use, but if the case is left in its original setting, it affords a parallel to the problem before us. Our project is not one of those in which the construction of what the public welfare requires also happens incidentally to provide something which it would be wasteful not to use. Our scheme was frankly designed from the beginning to provide a large amount of excess space for private leasing. It is, therefore, as if the dams in the *Kaukauna* case had been planned to create "a wholly unnecessary excess of water" merely to be "leased to private individuals".

It is true that in the *Kaukauna* case the enabling act had not ordered the authority to make the navigational improvements self-supporting, while the General Assembly has done so in respect to the project before us. Further, ·it is said to be important that all the funds from the private business are assigned to the public service feature of this project.[1] The contention is, therefore, advanced that although in the absence of this legislative action one phase of our project would be deemed a "private" enterprise, the device of a statutory union of the two phases is so efficacious that the improper purpose has been overcome by the proper one.

This attempted amalgamation of two projects of differing kinds so as to change the character of one of them seems to be a species of economic gerrymander. This must be just such a scheme as the *Kaukauna* opinion proscribed as a "colorable device" to earn revenue. Allocating the revenue to a specific public purpose, rather than running it through the general fund, seems to be little more than a glorified bookkeeping maneuver and can hardly obscure the fact that one entire phase of this project—itself requiring tax monies and eminent domain—is designed, in the above-quoted language of Cooley's Constitutional Limitations, "for the mere purpose of adding to the revenues of the state".

Moreover, it must not be forgotten that the limitations we are here concerned with are of constitutional character, so that the court can-

---

1. Ignoring the fact that 40 years from now, when the bonds are all retired, the unencumbered physical property will represent clear profit.

not permit them to be set aside or circumvented by a mere act of the legislature.

But it is argued that the economic ideas here expressed are no more than a relic of the past; that the constitution, on the other hand, is a "living" instrument; that, as proof of all this, we see about us on every side governments openly engaged in business of every description. We noticed that in the *Kaukauna* case selling water power was talked of as if it were a peculiarly private matter, no more affected by the public interest than a refreshment stand. Yet today we see about us such giants of public fabric and finance as the Tennessee Valley Authority.

We see all these things, truly enough, but the point urged is not thereby established. It is one thing to say that the constitution is a living instrument, but quite another to say that it has neither essential form nor enduring principle. To the uncritical glance the swift evolution of economic and social ideas may appear to have wrought an overthrow of principle. This I do not concede. Time alters the definition of a public use. What is a luxury today is indispensable tomorrow, and that truth applies to people collectively as well as to individuals, but the principle that the government may not engage in private business except when and to the extent demanded by the public interest remains, I believe the governing consideration.

What has happened in the State of North Dakota is extreme enough to illustrate the point. A code of laws was passed several years ago authorizing that state to go into the business of grain processing and sale in all of its aspects—involving the building and operation of grain elevators, warehouses, mills, transportation facilities, and the like, the establishment of brokerage outlets and exchanges, and to top it off, the creation of a bank to handle the financial side of this enormous and extraordinary venture.

The constitutionality of these laws was tested in the courts, as the result of which the highest court of North Dakota affirmed findings that 90% of the income of the inhabitants of that state was derived from agriculture, that private capital had failed to provide sufficient

facilities to furnish the people of that state a decent market for their products, and that, among other unfortunate consequences of this deficiency, the farmers of the state were losing upwards of $50,000,000 annually. *Green v. Frazier,* 44 *N.D.* 395, 176 *N.W.* 11.

When the case went to the Supreme Court of the United States, the ruling of the North Dakota courts was affirmed. 253 *U.S.* 233, 40 *S.Ct.* 499, 64 *L.Ed.* 878. From the opinion one gains the impression that the learned justices may have thought that North Dakota had gone a long way, but they recognized that under the peculiar economic conditions found to exist in North Dakota a case had been made out that there was a genuine public need for what was being done. It seems clear that elsewhere, and under different conditions, these same activities might have been branded as socialism.

But if what is here attempted can be done, what could the government not do?

Chief Judge Lehman's opinion in *Bush Terminal v. City of New York,* 282 *N.Y.* 306, 26 *N.E.2d* 269, describes the test between what is a proper activity and what is improper as a sort of relative, quantitative thing, a matter of "degree". It holds that if, upon analysis (however that is to be accomplished), the proper purposes appear to be the "dominant" ones, the accompanying improper ones, being only "incidental", are thereby validated; but if the improper ones are dominant, the whole scheme is vitiated. The optimum balance under this theory would presumably be achieved by starting with a genuinely public project and piling upon it as many private purposes as it could bear without forfeiting its classification as public.

But what qantities are to be measured in this type of test?

If space is of the essence, the Wilmington Parking Authority has been conservative. Only 39% of the space of this project is to be allocated to private purposes. It would seem that more than 49% and less than 50% would have been possible. Yet in the *Bush* case space must not have been the vital thing, for 14 stories of a 16-story building were there devoted to commercial leasing.

Can income be the criterion? If so, the rule has here been violated, for 69.5% of the income of this project is to come from commercial leasing. In the *Bush* case it was 98%.

Cost? Apparently not, for here the cost of the space to be commercially leased involves 61.6% of the total.

Another suggestion seems to be that the "dominant" purpose is the one which primarily motivates the project, while what is not wanted, or not wanted very much, is only incidental. The settlement of vital rights of property by any such evanescent and wholly subjective test must surely be as dangerous as it would be unprecedented. Moreover, what motive is meant? Would it be the motive of the author of the bill, of each legislator who voted for the bill, or of a majority of the majority, or whose? Or does a law itself have a motive? If so, surely the test of that must be objective. Yet we have already canvassed in vain the only objective tests which have been suggested.

This quantitative rule for finding what is paramount and what is only incidental seems unsound and unworkable, no matter whether it is sought to measure space, or revenue, or cost, or motivating desire.

The reasoning of the *Kaukauna* case, on the other hand, puts forward a rule which seems sound. It holds that it is only such features of the project as are demanded by the needs of the public that the state has the affirmative right to establish. If in establishing those authorized ones other facilities are necessarily provided, the by-products, though not proper objects of public enterprise when standing alone, can in these circumstances nevertheless be turned into money. There is no requirement that waste be committed as a sacrifice to legal theory. In this sense of the word "incidental," the true test is whether what is turned into money after the manner of private enterprise has resulted "incidentally" from the construction or establishment of facilities for a proper public purpose. If so, it is within the governmental field; if not, it is an unwarranted invasion of the private domain.

We could apply this rule and obtain a result favorable to the Parking Authority if it presently needed space for only 800 cars but

found it prudent now to build a building for the eventual accommodation of 1200 cars, or if they built for 800 and later learned that they had overestimated their requirements. But in our case there are no such facts. It is stipulated that 800 is the largest number of cars which it is feasible to route through the surrounding streets.

If this type of legislation should be generally sustained, I am at a loss to see how private enterprise could obtain any protection at all from government competition. If, as is here attempted, the cost of one or some of the functions which are admittedly proper for the government can simply be assigned to be paid out of commercial ventures having no relation to public functions except to support them, and if this can be made a "necessity" by having the legislature enact a law saying so, we may in time expect the familiar branches of the government service—the courts, the schools, the police, and the like—to be so supported. And if new public services may be voted simply by ordering the government to pay the attendant bills out of some manufacturing enterprise, chain of stores, or professional service, we may reasonably anticipate some very progressive experiments. The implications of the new powers here unloosed are limitless. Without first class management and operating economy, it might ultimately require the revenues of all private enterprise to run the government. And in the meantime it might prove difficult to put down any scheme, however harebrained, if it could be promoted under the pretense that it would cost the public nothing. In the end, of course, it would cost the public everything.

Two authorities other than the opinion of the majority of this court seem to say that the legislative device here involved is sustainable: *Bush v. New York, supra,* and *Shizas v. City of Detroit,* 333 *Mich.* 44, 52 *N.W.2d* 589.

I should hope to distinguish the *Bush* case on the ground that Chief Judge Lehman's opinion did no more than to interpret the language of a statute defining the powers of the Port of New York Authority. He does not cite or expressly mention the constitution. But if the learned judge's opinion is properly to be construed as a ruling on constitutional law, then I have no choice but to disagree with it.

As a matter of interest, the application of the rule favored in this opinion would not necessarily have changed the result of the *Bush* case. There were some facts there which were very different from those before us. A freight terminal for the eight railroads required a square block, facing on four streets. Thus the limits of the area to be condemned were fixed by the public need. And it might very reasonably have been found on competent evidence to be wasteful to build a two-story building in that location, among Manhattan's tall buildings. In our case, on the other hand, it is obvious that more land is required for 800 cars to be parked in a four-story building, leaving 39% of all the floor space available for other uses, than would be required merely to provide for parking 800 cars in four stories.

While *Shizas v. Detroit, supra,* struck down the Michigan law as unconstitutional, it does contain some language supporting the inference that if Detroit had been unable to finance the parking project without the renting of stores, the court might have upheld the law. This hypothetical suggestion is, of course, pure *dicta* and may have stemmed from nothing more juridical than esteem for the eminent court which decided the *Bush* case.

I am, therefore, forced to the view that *Chapter 5, Title 22, of the Delaware Code,* as amended, is unconstitutional as purporting to authorize land to be condemned for, and tax monies to be invested in, a facility of which a considerable portion is to be devoted to purposes in which, under the circumstances shown, a government constitutionally wedded to capitalism may not engage. I believe that the City of Wilmington should simply be left to determine whether its need of a parking facility is sufficient to justify building and maintaining one in the ordinary way.

I should, therefore, answer the first, second, and fourth certified questions in the negative. The third one is so worded as not to invite a person of my convictions to answer it. Otherwise, I should have concurred in the majority opinion in respect to it. As to the fifth and sixth questions, the Chief Justice speaks for all members of the court.