Petition of SHELL OIL COMPANY, a Delaware Corporation.

*(September* 29, 1964.)

LYNCH, J., sitting.

*Richard J. Abrams* (Richards, Layton & Finger), for petitioner, Shell Oil Co.

*Norman N. Aerenson*, Atty. for Levy Court of New Castle County, Wilmington, for Board of Adjustment.

Superior Court for New Castle County, Civil Action No. 3066, 1964.

LYNCH, Judge.

Shell Oil Company (referred to hereafter as "Shell") applied to the Zoning Board of Adjustment (hereafter referred to as "Board") for a "Special Permit" under Article XVIII, § 4(1) of the New Castle Zoning Ordinance to erect a free standing product identification sign (hereafter referred to as "sign"). It was to be 25 square feet in area[2] and 19 feet high and located 17 feet from the northwesterly property line of its property, 20 feet from the curb line, parallel to Lancaster Turnpike, and 7 feet from the front property line of its premises. The Board denied the application. On rehearing, Shell, for the first time, characterized its application as one for "variance", assumedly under Article XVIII, § 4(2) of the Ordinance. The Board granted a "Special Permit" to Shell but restricted the location of the sign to an area to be designated not less than 30 feet from the curb line, parallel to Lancaster Turnpike and 17 feet from Shell's front property line. The map accompanying the Board's Decision, however, characterized its Decision as a "variance", notwith-

---

[2]Article VI, § 1(9) of the Zoning Ordinance restricts the size of "free-standing identification" signs to "not more than twenty (20) feet in area". Article III of the Zoning Ordinance defines a "sign" as a structure; the same Article states a "building" includes a "structure". Article XI (6) of the Ordinance requires buildings on property zoned C-2 to be "set back 40 feet". Article XV, § 2(c) of the Ordinance states "gasoline pumps" are to be set back "at least" 15 feet from the street line.

standing the language of its Decision, purporting to grant a "Special Permit".

Shell now contends (1) that a "Special Permit" was not, in fact, required for erection of the sign[3] and (2) the Zoning Ordinance contained no restriction upon either the size[4] or location of the proposed sign; further that the Board could not validly apply the proposed restriction. Shell seeks in these proceedings to eliminate the Board's restriction on the location of the proposed sign. It also argues a "variance" is not required.

At the hearing, the attorney for the Levy Court filed a Motion to Dismiss the proceedings: (1) because Shell had deeded its property on March 30, 1964 to Stafac, Inc. and no longer was it the real party in interest and (2) because the Board had no power vested in it to grant a "special permit" of the nature sought by Shell's application. Since both parties have pressed this point in briefs and at argument the Court will examine it, but before doing so will make appropriate references to Shell's affidavit.

Shell by this affidavit, concedes that it did, in fact, on March 30, 1964, convey the subject premises to Stafac, Inc., together with more than "100 other service station properties"; that on April 1, 1964 this property was "leased" back to Shell "for a primary term of 25 years" with options to extend the lease and/or "repurchase title to the property".

Continuing, the affidavit states:

---

[3]It was Shell which denominated its application to the Board as one for a "Special Permit".

[4]Article VI, § 1(9) limits the size of identification signs to "not more than twenty (20) square feet in area accessory to" a service station. It is highly questionable that under the guise of a "variance" a Zoning Adjustment Board can allow a sign of the size applied for here, New Castle County Zoning Ordinance, Article XVIII, § 4(2).

"Under the terms of this lease back arrangement, Shell has the express, and exclusive, right to construct or alter the premises, buildings and improvements—expressly including signs—and to take any action necessary to carry out such proposed construction or alteration, including applications for necessary permits. Under the terms of this lease back arrangement, Shell remains, for all practical purposes, the beneficial owner of the property and all rights of use pertaining thereto.

"(c)  The purpose of this not-unusual sale-lease back arrangement is related not only to the tax savings obtained by Shell through a business deduction for rental payments, but also its internal financing requirements and the prompt recovery of the initial and heavy outlay for the purchase price and cost of property improvements on the substantial number of service stations covered by this arrangement. Following the recovery of this substantial outlay, Shell is enabled to utilize these stations without a continuing heavy capital investment, and under a uniform rental arrangement with 'Stafac, Inc.'. Another advantage is that 'Stafac, Inc.', a company which was formed at the suggestion of Shell itself, can then act as an investment depository for pension funds and other large investors, thereby assuring a sound and large real estate investment with an assured and advantageous rate of return from the rental payments.

"(d)  'Stafac, Inc.' has no real function and no practical interest in the actual properties other than collecting the rentals therefrom. Shell retains, to all practical effect, all rights and duties of an actual owner. Since 'Stafac, Inc.' is a mere non-managerial investment company, the Petitioner submits that no purpose would be served in having 'Stafac, Inc.' formally enter these proceedings as the technical owner of this property—partic-

ularly when Shell itself, as lessee, has sufficient standing to press the present appeal, * * *."

Shell's affidavit refers to its petition for rehearing—filed after the Board denied the application for a "Special Permit"—as one for a "variance" and contends that Shell can submit its arguments under the theory that it had originally applied for a Special Permit, or as later characterized, as a "variance"[5].

This use of these conflicting terms will be considered later, as the Court believes that proper use of legal terms is in the interest of proper comprehension of opinions. At this point it is sufficient to point out that neither Shell's contentions nor the Board's reasoning in granting a "Special Permit" or "variance"—call it what you will—support the result sought by Shell. The Court's ruling on the Board's Motion to dismiss the appeal will be deferred for the present, so as to consider the jurisdiction of the Board over signs—especially the type involved in this appeal.

Title 9 *Del. C.*, § 2603, states the purpose for the adoption of the Zoning Code:

"(a)  *  *  * *for the purpose of* promoting the health safety, morals, convenience, order, prosperity or welfare of the present and future inhabitants of this State, including, amongst other things, * * *, promoting such distribution of population and *such classification of land uses* and distribution of land development *and utilization as will tend to facilitate and provide adequate provisions for* public requirements, transportation, water flowage, water supply, drainage, sanitation, educational opportunities, recreation, soil fertility, food supply, pro-

---

[5]See footnote 4, supra, page 576. Under the power of the Levy Court to control "uses" of property in New Castle County, it would seem no question can be raised such as Shell would pose.

tection of the tax base, securing economy in governmental expenditures, fostering the State's agricultural and other industries, and *the protection of both urban and non-urban development.*

"(b) The regulations shall be made with reasonable consideration, among other things, of the character of the particular district involved, its peculiar suitability for particular uses, the conservation of property values and natural resources and the general and appropriate trend and character of land, building and population development." (Emphasis supplied)

Article XVIII, Section 4, subsections (1), (2) and (6) of the New Castle County Zoning Ordinance grants the Board these powers:

"Section 4.    ORIGINAL    JURISDICTION — The Board of Adjustment may in a specific case after public notice and hearing and subject to appropriate conditions and safeguards to be prescribed by said Board determine and vary the regulations herein established in harmony with their general purpose and intent as follows:

"(1)    Grant special permits[6] as provided in the preceding Articles of this Code as follows:"
Title 9 *Del. C.,* § 2617 provides:

"Upon appeals the Board of Adjustment shall have the following powers:

"(1)    To hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision or refusal made by an administrative official or agency based on or made in the enforcement of the zoning regulations.

---

[6]See page 580, post.

"(2)   To hear and decide, in accordance with the provisions of any zoning regulation, requests for special exceptions or for interpretation of the map or for decisions upon other special questions upon which the Board is authorized by any zoning regulation to pass.

"(3)   Where by reason of exceptional narrowness, shallowness or shape of a specific piece of property at the time of the enactment of the regulations, or by reason of exceptional topographic conditions or other extraordinary and exceptional situation or condition of such piece of property, the strict application of any regulation adopted under this chapter would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the owner of such property, to authorize, upon an appeal relating to such property, a variance from such strict application so as to relieve such difficulties or hardship; provided such relief may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the zone plan and zoning regulations."

Careful examination of Title 9 *Del. C.*, Chapter 26, and the amendments thereto, fails to disclose the grant of any power by the General Assembly to the Levy Court of New Castle County involving "Special Permits" and/or to the Board of Adjustment, hence the Court is forced to conclude there is great doubt as to the Board's power to grant any "Special Permits".

Assuming the Board's power to grant "Special Permits", such power as the Levy Court may have granted to the Board, does not include the power to grant a "Special Permit" under the facts and circumstances presented by Shell's application. This appears from analysis of that Section of the Zoning Ordinance purporting to authorize the grant of "Special Permits".

¶ 1(a) purports to permit the conversion of a large one-family dwelling, located in R-1, R-2, R-3 or R-C zones for the use of two or more families. ¶ 1(b) permits the raising of mink or foxes in an R-2 or R-C zone; ¶ 1(c) permits location of given types of hospitals in R-2 or R-C zones; ¶ 1(d) permits trailer parks in certain areas under stated conditions; ¶ 1(e) permits radio or television broadcasting towers in R-2 or R-C zones; ¶ 1(f) permits erection in R-C zoned property of private or governmental office buildings for businesses engaged in certain enumerated activities; ¶ 1(g) permits drive-in theatres in C-2 zoned districts; ¶ 1(h) permits certain light manufacturing operations to be conducted in lands zoned M-1; ¶ 1(i) permits certain manufacturing and industrial uses, of the types therein specified, in properties zoned M-3; and ¶ 1(j) authorizes the Board, under certain named circumstances, to review site plans for large residential developments and make its recommendatitns to the Levy Court "in regard to variances in the use, height and area provisions" of the Code.

The foregoing are the only instances where the Zoning Board could possibly grant "Special Permits"—assuming the Board had the power, and the fact that the General Assembly had not authorized the Levy Court to empower the Zoning Board to grant "Special Permits". Counties only have those powers which are expressly given, 14 Am.Jur. Counties § 28; 20 C.J.S. Counties § 49 and at page 802 (Id.) it is said—"Powers not conferred are just as plainly prohibited as though expressly forbidden; * * *."; compare *State v. Burris*, 6 Boyce 133, 138, 97 A. 387 (Gen.Sess., 1916); *State v. Warwick*, 9 Terry 568, 575, 577, 108 A.2d 85 (Super.Ct., 1954); *State ex rel. Willis v. Keenan*, 7 W.W.Harr. 191, 199, 181 A. 213 (Super. Ct., 1935); and *Olivere v. Taylor, Sheriff*, 31 Del.Ch. 53, 61, 65 A.2d 723 (Ct.Ch., 1949). In *Bave v. S. & S. Build-*

*ers, Inc.,* 36 Del.Ch. 543, 545, 134 A.2d 709 (Ct.Ch., 1957) it was specifically said—"* * * [The Zoning] Code can be no broader than the statutory grant of power".

The Levy Court, pursuant to 9 *Del. C.,* § 2617(3), has granted, see Article XVIII, § 4(2) of the Ordinance, power to the Zoning Board of Adjustment to grant variances, as stated in this language:

"(2) Vary the requirements of this Code where by reason of exceptional narrowness, shallowness, or shape of a specific piece of property at the time of adoption of this Code or by reason of exceptional topographic conditions or other extraordinary and exceptional situation or condition of such piece of property, the strict application of any regulation would make it impractical for the owner to use said piece of property for a proposed principal building and building accessory thereto in conformance with those requirements of this Code and thus would result in peculiar and exceptional and undue hardship upon, the owner of such property; provided such variance may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of this Code."

The above cited provisions of the New Castle County Zoning Ordinance is to be compared with the Statute, supra, page 849; it shows some difference in language. In the Ordinance the variance may be granted only where "the strict application of any regulation would make it impractical for the owner to use said piece of property for a proposed principal building and building accessory thereto in conformance with" the requirements of this Ordinance. This language, however, does not appear in the Statute. Did the Levy Court intend to give less power, in the granting of variances, to the Zoning Board of Ad-

justment, than was given by the Statute? Will the Statute prevail over the Ordinance? Is the variance to be granted according to the Statute or according to the Ordinance? It is unnecessary for the Court to decide these questions because of the application that Shell made. According to the application, the area of the proposed free standing product identification sign is to be 25 square feet, whereas Article VI of the Zoning Ordinance prescribes that the area is not to be more than 20 square feet.

The Zoning Board of Adjustment had no power, either under the guise of a "variance" or "Special Permit", to authorize Shell to place a free standing product identification sign 25 square feet in area. The power to grant a variance does not include the power to amend the Zoning Ordinance or to grant the sought for relief if it will be in violation of the Ordinance. See *In re Application of Emmett S. Hickman Co.*, 10 Terry 13, 108 A.2d 667, 671 (Sup. Ct., 1954) ; *In re application of A. A. Julian*, 3 Storey 175, 167 A.2d 21 (Super. Ct., 1960) and Yokley, Zoning Law and Practice, 2d Ed. at § 140.

I, therefore, rule that in view of the specific language of the Ordinance the Zoning Board could not authorize a free standing product identification sign with an area of 25 square feet and this Court cannot, by reason of any powers granted it, approve what the Zoning Board of Adjustment undertook to do by its Decision.

I likewise rule that *Bave v. S. & S. Builders, Inc.*, 36 Del.Ch. 543, 134 A.2d 709 (Ct.Ch., 1957) is determinative of this case so far as it involves the question of whether the Zoning Ordinance can or cannot control the location and size of signs on lands where it is in violation of the stated "use" of the lands, according to the Ordinance and the Plan.

This cited case involved a suit to enjoin a land developer from building a road across one of defendant's own lots, classified R-1 residential, so as to service an area for development of other lands belonging to the defendant. Plaintiff contended that the restrictions in the County Zoning Ordinance precluded defendant's "use" of its land for road building purposes, without first getting the lot reclassified by the Zoning Commission under the Zoning Ordinance.

In granting judgment to plaintiff, the Chancellor, after reviewing the Statute and Ordinance to ascertain the purposes herein set forth, ruled 36 Del.Ch. 545, 134 A.2d 710:

"It can be seen that the Levy Court is granted the power by statute to regulate the use of land in the county for certain broadly defined purposes. *The enumeration of purposes, of course, justifies the implication that the use of land for other purposes is not subject to the control of the Levy Court.* \* \* \*" (Emphasis supplied)

Later, 36 Del.Ch. 546, 134 A.2d 711, the Chancellor said:

"Article III, § 3 of the Zoning Code provides that premises (which include a vacant lot) which in effect have been zoned for a particular purpose shall not be used for any purpose other than a use permitted therefor by the Code. Clearly the use of the defendant's lot for a public road is not a permitted use under the existing zoning classification of defendant's lot. Thus, it cannot be so used without approval of the zoning authorities unless the Code does not apply to public road uses."

I have previously noted that both Shell and the Zoning Board of Adjustment have confused the use of the terminology appearing in the Statute and/or Ordinance,—

particularly with respect to the confusion in the use of the terms "Special Permits" and "variances". Our Supreme Court has previously noticed, in the case of *In Re Application of Emmett S. Hickman Co.*, 10 Terry 13, 25, 108 A.2d 667, 673 (Sup.Ct., 1954), this confusion and misuse of terminology in the zoning Statute and/or Ordinances. The Supreme Court pointed out the desirability,— if not the necessity—for those dealing with the zoning Statute and zoning Ordinances to distinguish the precise meaning of the terminology and use the terms in their proper sense. See Vol. 1, Yokley, Zoning Law and Practice, 2d Ed., at §§ 132, 133 and 101 C.J.S. Zoning §§ 271-274.

Certain comments seem appropriate of the Board's language and reasoning in granting Shell such relief as it did grant. *First:* Shell, in planning and constructing its service station created the problem of visibility of a product identification sign, directing attention to the station, which it would correct by its application, and for that reason is not entitled to any "variance", see Application of Julian, supra, 3 Storey at page 186, 167 A.2d at pages 26 and 27.

*Secondly:* The decision of the Board is in conflict with the "set back" provisions of the Zoning Ordinance, i.e. which states that the set back must be 40 feet. The Board did not make the necessary findings, such as this Court has held in *Garden Court Apartments v. Hartnett*, 6 Terry 1, 7-9, 65 A.2d 231, 235 and Application of Julian, 3 Storey at p. 182, 167 A.2d at p. 25, are required. It is to be noted that the Statute and the Ordinance require findings of particularly enumerated types in those situations where a variance may be granted; here the Zoning Board of Adjustment went beyond the provisions of the Statute and the Ordinance; it did not make the re-

quired kind of findings but seemingly relied on matters of competitive or economic factors, Yokley, § 139 and 101 C.J.S. Zoning § 293. Assuming Shell's application to be one for a "variance", as has been noted, the Board authorized Shell to install a free standing product identification sign in violation of the law.

■ I hold that Shell's contention it did not need to apply for a "Special Permit" and/or for a "variance" is without substance and authority, in light of the clear meaning of the Statute and Ordinance which classified the use that could be made of the land Shell owned, when it started these proceedings. Shell could not have proceeded to erect a free standing product identification sign except as permitted by the Zoning Statute and/or Ordinance and in accordance therewith.

Coming now to consider the motion to dismiss, made by the Zoning Board of Adjustment, on the ground that (1) Shell had deeded the property on March 30, 1964 to another corporation and so was no longer the real party in interest, in light of the conceded facts in Shell's affidavit in opposition, it is clear that the first ground for dismissal cannot be challenged.

As appears from the affidavit, supra, page 848, Shell conveyed "all its right, title and interest" in the land which is the subject matter of the proceedings to another corporation on March 30, 1964. I know of no way that this Court can ignore these facts and the differences in the corporate entities. Shell concedes that when it filed its petition for certiorari on April 29, 1961, it "was not the owner of said tract of land", but, says Shell, it is now the lessee of the premises, and that the present owner "has no real function and no practical interest in the actual properties other than collecting the rentals therefrom. Shell retains, to all practical effect, all rights and duties

of an actual owner."

Shell contends it has standing before this Court as an "aggrieved person", but wholly ignores the fact that its status before the Zoning Board of Adjustment is entirely different from the position it has now assumed before the Court. Shell wants the Court to say that this difference is of no moment and that the Court should ignore the change in status.

In a proceeding involving review of an administrative order, the reviewing Court is bound by the record certified to it by the administrative agency and there is no power in the reviewing Court to amend the record,—certainly not to meet an exigency such as is presented here. The Court cannot ignore the fact that Shell is no longer the "owner" of the premises; the Court is forced to recognize the changes Shell itself effected by its deed of March 30, 1964. Under no stretch of the imagination can it be made to appear that Shell was the "owner" when it filed its petition seeking review of the Board action by certiorari proceedings. No provision is made in the Statute or the Rules of this Court for changes in or amendment of papers certified to it by the Zoning Board of Adjustment, pursuant to the provisions of 9 *Del. C.*, § 2618(b). Hence, the Court rules that Rule 25(c), Rules of the Superior Court, *Del. C.*, providing for substitution of parties is not applicable, as Shell contends and hence Shell is not an "aggrieved person" under 9 *Del. C.*, § 2618 (a).

The power of review of zoning proceedings by this Court is limited by Statute. See Yokley, Zoning Law and Practice, 2d Ed., Vol. 1, § 172 and 101 C.J.S. Zoning § 321, pp. 1106-1110. *Lindenwood Improvement Ass'n v. Lawrence*, 278 S.W.2d 30 (Mo.App.), held a corporation which did not own the land was not an "aggrieved per-

son"; see further Vol. 2, Rathkopf, The Law of Zoning and Planning, at 40-6.

Much as the Court sympathizes with Shell's dilemma, it cannot in honesty hold that it is the legal owner of the property, nor was it such when the certiorari proceedings were commenced. The Board has never considered Shell's relationship to the land as its lessee; this may or may not be of importance but it is a question that must first be considered by the Board since the Superior Court is limited in matters of review originating in the Zoning Board of Adjustment.

Shell has raised some constitutional questions, but in light of the record and the fact that the Court is dismissing the appeal on the first ground of the Board's motion to dismiss, it would seem inappropriate for this Court to consider and pass on such constitutional questions.

An order may be presented carrying into effect the conclusions stated herein.