**The LEVY COURT OF KENT COUNTY, a political subdivision of the State of Delaware, Plaintiff,**

v.

**The CITY OF DOVER, a municipal corporation of the State of Delaware, Defendant.**

Court of Chancery of Delaware, Kent.

Submitted May 23, 1974.

Decided Aug. 22, 1974.

N. Maxson Terry, Jr., of Terry, Terry & Jackson, Dover, for plaintiff.

Nicholas H. Rodriguez, of Schmittinger & Rodriguez, Dover, for defendant.

BROWN, Vice-Chancellor.

In this action the Levy Court of Kent County, being the governing body for that political subdivision of the State (hereafter "County"), seeks declaratory relief to have a written agreement consummated on August 12, 1969 with the defendant, The City of Dover, a municipal corporation of the State (hereafter "City"), declared void and unenforceable as having been an improper exercise of its governmental authority.

The agreement in issue, popularly known as the "Buffer Zone Agreement", is a creature born of a dispute between the two governmental entities over which of them should be entitled to provide sewer and water services to an area surrounding the then existing corporate boundaries of the City. The City had maintained its own sewage disposal plant and system, and also its own water system, for many years prior to the date of the agreement. The County, however, neither provided such services

nor had the power to do so until 1967 when legislation was enacted by the General Assembly which extended to the county the discretion and authority to construct and maintain sewer and water systems at such locations within its territorial boundaries as it deemed necessary or convenient. 9 Del.C. Ch. 45; 9 Del.C. Ch. 46.

About this time, the City was giving consideration to the construction of a new treatment plant and the future enlargement of its service. It also undertook to study the feasibility of joining the county-wide sewage system contemplated by the County. Ultimately, each side formally requested the other to join its sewage system but, for reasons not pertinent here, neither was willing to go in with the other, and consequently an impasse was reached. Early in 1969, the City resolved to proceed with its own plans.

In so doing, the City caused its civil engineering firm to study and make recommendations as to the maximum area around the City that could be properly provided with City services and which would thus constitute a realistic expectation, as well as limitation, for future city growth. Such recommendations were duly received, and the City purchased a farm near the edge of town as the site for its new plant.

During this interval of time, public controversy continued as to the wisdom and necessity of both the City and the County putting their respective taxpayers to the expense of constructing new treatment plants when it was obvious that one facility could handle the needs of both. Eventually, as a result of renewed negotiation, the parties resolved the situation by entering into the aforesaid agreement.

The agreement itself is a simple one-page document with attached boundary descriptions which contains no stated term and which therefore appears to bind the parties indefinitely.* As I interpret its

* The text of the agreement reads as follows:
  "WHEREAS, the First Party [County]

has established a County Sewer System and has compiled a comprehensive plan for the

language, it accomplished the following: In return for the promise of the City to join the County sewerage system, the County agreed to do two things, namely, (1) to recognize the growth recommendations of the City's engineers as being the future corporate limits of the City, and (2) to not, at any time thereafter, furnish sewer and water in the area contained within these future growth limits based on the understanding that such services would be left "to the annexation and furnishing of sewage and water facilities by the City of Dover or by other municipalities". The area described, which lay outside the City but which encircled its then existing corporate boundaries, thus became known as the "buffer zone".

In consideration of this territorial recognition by the County, the City further agreed to forego the planned expansion of its own sewage treatment facilities. It is without doubt that in the absence of this concession the City would not have agreed to join the County sewer system. Since the availability of City water and sewer service is one of the primary features offered by the City to induce nonresident property owners to vote for annexation into the City, the benefit bargained for by the City was the continued absence of County services within the buffer zone and thus the continued opportunity to expand its corporate limits to full potential. From the standpoint of the County, the assured participation by the City in its sewerage system enabled it to obtain a substantially larger grant of federal construction funds and also facilitated and expedited the acquisition of such funds. Further, the add-

ed volume to the system paved the way for the County to assess a substantially lower user fee to county residents.

On the strength of this accord, construction of the County system went forward, and finally, on May 30, 1973, the City hooked into the system, thus completing the performance of its obligation under the agreement. Some three weeks later, on June 19, 1973, the County filed this suit to have the agreement declared void. In brief, its stated reason for this action is based on the fact that many residents of a heavily populated area in the buffer zone lying to the south of the present city limits, who ostensibly do not wish to be annexed into the City, have requested that the area be provided with County water and sewer. Also contributing to the decision to bring suit is the fact that the governing body of the County is composed of seven elected officials, and four of the members in office at the time that the agreement was executed have since been replaced.

It is the present policy of the City that it will not extend sewer or water into an area outside its corporate limits, even though it may lawfully do so under its charter. In addition, it will not hold an annexation referendum as to a given area unless a meaningful request for annexation is received, and so far there has been no such request from the area south of town. Thus the City is presently unwilling to service this portion of the buffer zone.

The County has offered evidence to show that although some 7,500 people live in this southerly area now, projections in-

furnishing of sewage facilities to the residents of Kent County; and

WHEREAS, the Second Party [City] has joined in said plan and has agreed to participate in the same; and

WHEREAS, the Second Party entered into said plan upon the consideration that First Party would recognize future limits for the expansion of the City limits; and

WHEREAS, First Party, on May 20, 1969, resolved that it would recognize the proposed future limits of the City of Dover.

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS, that the parties hereto, their successors and assigns, mutually agree that the attached land description shall be recognized as the tentative future limits of the City of Dover; and

THAT First Party shall not furnish sewage or water facilities in this area, the same being left up to the annexation and furnishing of sewage and water facilities by the City of Dover or by other municipalities."

dicate that by 1990 the population for this same area may well reach between 22,000 and 28,000. With only minor exception, sewage is now being disposed of through individual on-site systems consisting of septic tanks or cesspools, and water is obtained through individual wells. Testimony from the State Director of the Division of Environmental Control indicates that during the past year there were thirty-nine reported instances of overflowing septic tanks in the area, and that testing reveals a high nitrate content in area water which is an indication of septic tank pollution of water wells and thus a potential health hazard.

The County contends that the agreement is ultra vires as to the County and contrary to public policy, and thus its action is not subject to the defense of estoppel asserted by the City. It further argues that the agreement is void because the County has no authority to grant a franchise and that as to residents of the County withing the buffer zone it denies them the equal protection of the law guaranteed by both the Delaware and United States Constitutions.

■ I feel that the argument based on the unauthorized grant of a franchise can be disposed of without problem. It is true that the counties of this State are not bodies corporate, but rather are political subdivisions possessing only those restricted powers and duties granted by statute. State v. Warwick, Del.Super., 9 Terry 568, 48 Del. 568, 108 A.2d 85 (1954). A county has only those powers which are expressly given, Petition of Shell Oil Co., Del.Super., 203 A.2d 845 (1964), and since the City apparently concedes that there is no statutory authority for the County here to grant a franchise, this lack of power can be assumed as a fact not in dispute.

■ At the same time, a "franchise" has been defined as a special privilege conferred by government on individuals (or corporate entities), which privilege does not belong to a citizen by common right. It derives by grant from the sovereign. Greater Wilmington Transportation Authority v. Kline, Del.Super., 285 A.2d 819 (1971). While the County thus may lack the power to delegate to others its right to operate a public utility as bestowed upon it by the State legislature, a short answer is that the City has already received authority to operate sewer and water systems by virtue of the charter given to it by the same sovereign body, which authority, as found in Section 25 and Section 26 of the City charter, allows the City, at its option, to extend water and sewer services beyond the city limits. Thus, if the City already has legislative approval to furnish sewer and water in the area of the buffer zone, it is of little consequence that the County lacks the power to delegate an exclusive franchise by private contract. At best, I view the County's agreement to be one not to compete in an area where both parties could lawfully exercise the authority granted by the State.

■ More troublesome, however, is the question of whether or not the County has authority to enter into a contract whereby it agrees not to exercise the discretion reposed in it by the legislature. The aforementioned statutes from which it derives its powers in this field are not mandatory, but rather grant it the power, in its discretion, to create sewer districts within the county and to construct and maintain water systems as it sees fit. 9 Del.C. ch. 45; 9 Del.C. Ch. 46. The County argues that such statutory discretion gives it a "right" to provide sewer and water service to inhabitants of the buffer zone in the event it becomes necessary for the protection of the public health, and that consequently this becomes a governmental right and duty which could not be ceded away by a predecessor governing body of the County.

The City argues that where discretion is given to construct, operate and maintain

such services, a governmental subdivision acts in a proprietary rather than governmental capacity, and that consequently it can, by contract, bind itself not to do business in a specified location. The City has a basis for its position by virtue of Delmarva Enterprises, Inc. v. Mayor & Coun. of Dover, Del.Supr., 282 A.2d 601 (1971) wherein it was specifically held "that the City, in supplying water and sewer services, is acting in its proprietary capacity and, in so doing, is operating a public utility, and is therefore subject to regulation as such". 282 A.2d 602. See also Mayor & Coun. of Dover v. Delmarva Enterprises, Inc., Del.Supr., 301 A.2d 276 (1973). In effect, the City argues that what is sauce for the goose is sauce for the gander, and that the County cannot claim a superior status for supplying the same service in the same area.

The County relies on Register v. H. Burton Elliott, Inc., Del.Super., 229 A.2d 488 (1967) where, in a tort liability situation, it was held that in constructing a sewer or in the supervision of such construction, a municipal agency acts in a governmental capacity. Both parties cite numerous authorities from other jurisdictions in support of their respective positions all of which serve to illustrate the fine line of demarcation involved in such a determination. Perhaps the true answer, if there is one, is contained in the observation of Chancellor Seitz in Pruett v. Dayton, Del.Ch., 39 Del.Ch. 537, 168 A.2d 543 (1961) that in determining whether the exercise of a statutory power is governmental or proprietary, the test is not whether it is permissive or mandatory but rather "the nature of the activity itself must be controlling". 168 A.2d 545.

■ Using this rationale, it seems to me from a review of the statutes that the purpose of the legislature, as a part of changing the County over to home rule status at the time, was to simply put the County into a position whereby, if it so desired, it could thereafter acquire, construct, own and operate sewer and water systems throughout its jurisdiction for the benefit of the inhabitants of any given area. The powers given are broad and are not confined to necessity or the interests of public health. See 9 Del.C. § 4502; 9 Del.C. § 4611. Therefore, in my opinion, the aforesaid statutes grant to the County the same general authority as the City charter grants to the City, namely, the authority to construct and operate a public utility for the purpose of furnishing sewer and water services. The nature of the activities thereby authorized is thus proprietary even though a public purpose is also served just as with other proprietary functions carried on by governmental bodies. Delmarva Enterprises, Inc. v. Mayor & Coun. of Dover, *supra*; 12 McQuillin, Municipal Corporation: (3rd Ed.Rev.1970) § 35.35.

From this determination, it necessarily follows that the decision of the County to relinquish as to a limited geographic area its future capacity to supply proprietary services in return for a valuable consideration plus the assurance that such services would be provided by another governmental entity, did not constitute an ultra vires act nor did it violate public policy *per se*. See Walla Walla City v. Walla Walla Water Co., 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341 (1898); Vicksburg v. Vicksburg Water Works Co., 202 U.S. 453, 26 S.Ct. 660, 50 L.Ed. 1102 (1906); 12 McQuillin, Municipal Corporations (3rd Ed.Rev.1970) § 35.16. This, however, is subject to one reservation.

As noted earlier, the Buffer Zone Agreement contains no time of duration, and consequently, on its face, it appears to be perpetual in its exclusion of County water and sewer service from the buffer zone. The City relies on this as the effect of the agreement. The County now agrees, and argues that the absence of a stated duration is a further reason for declaring the agreement void. Clearly, if the

agreement is perpetual in its restriction against County services, then the owners of property within the buffer zone ultimately may have no choice but to seek annexation into Dover or some other municipality in the event that increasing population and health considerations necessitate connection to a sewer and water system. Viewed in this light, and if the agreement is perpetual in effect, then it becomes obvious that the parties, in resolving their own differences, have divided up the territory based on the fallacious assumption that all residents of the buffer zone must eventually become annexed to the City of Dover, or some other municipality, whether they like it or not. Otherwise, they will forever do without sewer and water even though it might readily be made available by either party without annexation. To this consequence I cannot give sanction.

It is the law of this State that municipal contracts of perpetual duration are not necessarily invalid, but, under some circumstances, they may be so unreasonable as to be ultra vires. Stated another way, the duration of a contract let by a municipality or other public body operating under a legislative grant of power must, in the absence of statute, be reasonable, having regard to the circumstances. Wilmington Parking Authority v. Ranken, Del. Supr., 34 Del.Ch. 439, 105 A.2d 614 (1954).

Thus, although the Buffer Zone Agreement is perpetual by its terms, this factor does not automatically render it ultra vires and void. Generally, if a contract for an indefinite time can be construed as continuing for a reasonable time by virtue of its obvious purpose, it can be sustained. 63 C.J.S. Municipal Corporations § 979, p. 534. And see Cox v. City of Pocatello, 77 Idaho 225, 291 P.2d 282 (1955); City of Gainesville v. Board of Control, Fla.Supr., 81 So.2d 514 (1955); City of Barre v. Perry & Scribner, 82 Vt. 301, 73 A. 574 (1909); 10 McQuillin, Municipal Corporations (3rd Ed.Rev.1970) § 29.102. Compare Wilmington Parking Authority v. Ranken, *supra.*

With this in mind, I note from the language of the agreement that the promise of the County not to furnish sewer and water in the buffer zone presupposes that these utilities will be made available in the area by the City (or other municipalities, whoever that might be) either through annexation or otherwise. In other words, although the County has agreed not to compete with the City within the buffer zone, it has done so on the assumption that the services that it can provide, but will not, will be provided by the City. In reality, the County, has agreed to step aside and let the City go after the buffer zone and annex it, if it can. However, the County has not agreed that all or part of the property owners in the buffer zone must hereafter go without sewer and water in the event the City cannot accomplish its goal. Thus emerges the reasonable time standard which must govern the restriction imposed on the County.

Certainly, responsible public servants comprising the governing bodies of the County and the City, both now and at the time the agreement was consummated, could never have intended that an agreement settling their private dispute should be used either as a sword to hold over the head of certain persons to compel the annexation of their property into the City or as a subterfuge to placate the City which could later be repudiated on technical grounds. I like to think that in executing and evaluating the Buffer Zone Agreement, both parties also had in mind the interests of those residing within the buffer zone as well as the interests of their respective governmental endeavors.

I am therefore of the opinion that at such time as it appears without question as to any reasonably definable area within the buffer zone that water or sewer service, or

both, has become necessary to the continued use and enjoyment of the property within such area, and it further appears that the City, whether due to inability or failure to annex or to the policy of its council, either can not or will not provide such service within a reasonable time, the restriction imposed against the County by the agreement may be considered terminated as to the geographical area involved. I feel that this is the only sensible interpretation that can be ascribed to the parties which is both in keeping with their respective governmental positions and which honors their contractual commitments to each other.

In reaching this conclusion, I take note that since the date of the agreement the City has annexed a considerable portion of the area contained within the buffer zone. Further, from the evidence presented, I cannot conclude that a sufficient factual basis has been established to permit the County to go forward with its sewer and water lines in the aforementioned area south of the City at this time, prior to any effort or request for annexation by the City.

This decision also seems to dispose of, at least for now, the County's argument that the agreement denies those in the buffer zone the equal protection of the law. This is assuming, of course, that the County had proper standing to make such an argument to escape from the consequences of its own contract, which is doubtful.

In summary, I find the Buffer Zone Agreement valid and enforceable subject to the aforesaid reasonable time restriction ascertained from a construction of its terms.

If this decision leads to future litigation concerning the needs of given areas within the buffer zone, it is unfortunate, but at the same time it is an unavoidable product of the limited document by which the parties were content to be bound. Counsel for the City may submit a form of order on notice.